Frank D. Miceli, Charles Minnich and Leander Krist, Token Claimants, Petitioners *v.* Commonwealth of Pennsylvania, Unemployment Compensation Board of Review, Respondent.

506

Argued September 9, 1985, before Judges CRAIG and DOYLE, and Senior Judge BLATT, sitting as a panel of three.

Paul J. Dellasega, with him, Ira H. Weinstock, Ira H. Weinstock, P.C., for petitioners.

Charles G. Hasson, Acting Deputy Chief Counsel, for respondent.

Michael T. Welch, with him, C. Grainger Bowman, McNees, Wallace & Nurick, for intervenor, Quaker Oats Company.

OPINION BY JUDGE CRAIG, December 17, 1985:

This appeal follows an order by the Unemployment Compensation Board of Review denying benefits to Frank D. Miceli, Charles J. Minnich and Leander D.

Krist, token claimants on behalf of similarly situated employees of the Quaker Oats Company, all of whom are members of Cereal Workers Directly Affiliated Local Union No. 221, AFL-CIO. The board vacated its earlier decision in favor of the claimants pursuant to a remand by this court for additional findings of fact. *Quaker Oats Co. v. Unemployment Compensation Board of Review*, 65 Pa. Commonwealth Ct. 72, 442 A.2d 369 (1982). Consistent with its new findings, the board concluded that the claimants' unemployment resulted from a work stoppage caused by a labor dispute other than a lockout within the meaning of section 402(d) of the Unemployment Compensation Law,[1] thus precluding recovery of benefits.

In *Quaker Oats*, 65 Pa. Commonwealth Ct. at 73-74, 442 A.2d at 370, this court stated the circumstances leading to the work stoppage at the Quaker Oats plant. A brief review follows.

On April 1, 1979, the collective bargaining agreement between the company and claimants' union expired after extensive negotiations between the parties failed to produce a new agreement. The following day the parties entered into an interim agreement providing that the union would not strike and the company would not institute a lockout without either party first giving the other 24 hours written notice.

During the next few weeks, company officials noted that production efficiency levels at the plant were steadily decreasing. At several meetings, employer officials asserted to the union's committee that

---

[1] Act of December 5, 1936, Second Ex. Sess., P.L. (1937) 2897, *as amended*, 43 P.S. §802(d), which provides that an employee shall be ineligible for compensation for any week:

> (d)  In which his unemployment is due to a stoppage of work, which exists because of a labor dispute (other than a lock-out) at the factory, establishment or other premises at which he is or was last employed.

this decline resulted from incidents of employee sabotage of machinery within the plant, a concerted work slowdown, and a widespread refusal by employees to work overtime shifts.

On April 26, 1979, the company announced that the plant would be shut down at five p.m. that day and rejected an offer by employees to return unconditionally to work. The company, claiming that the impasse in collective bargaining had precipitated the recent employee actions, construed those actions as an in-plant strike.

## 1. *The Legal Principles*

The claimants' eligibility for benefits is contingent upon a determination of whether the employees, either through alleged acts of sabotage, a concerted work slowdown or refusal to work overtime, or the company, through the plant shutdown, caused the work stoppage. *Philco Corp. v. Unemployment Compensation Board of Review*, 430 Pa. 101, 242 A.2d 454 (1968). In *Philco*, the Supreme Court articulated the test for determining whether a work stoppage, pursuant to a labor dispute, is the result of an employer-initiated lockout or an employee-initiated strike. The court stated:

> Since the purpose of our unemployment compensation system is to compensate an individual when work has been denied him through no fault of his own, logically the test of whether a work stoppage resulted from a strike or a lockout requires us to determine *which side, union or management, first refused to continue operations under the status quo* after the contract had technically expired, but while negotiations were continuing.

*Philco*, 430 Pa. at 103-04, 242 A.2d at 455 (emphasis added).

Under this standard, the board has made new findings of fact to support its decision denying benefits to the claimants:

12. The claimants first altered the status quo by refusing to perform overtime work and by causing instances of sabotage to the employer's equipment.

13. The work stoppage affecting the claimants was a strike rather than a lockout.

The fact that Finding No. 12 refers to the token claimants as a union group was confirmed by the board in its discussion, stating:

The evidence is clear that claimants actively participated in the strike, were members of the organization involved in the work stoppage, and were members of the same grade or class of workers employed at the work site immediately before the work stoppage.

The question of whether the work stoppage resulted from a strike or lockout is a mixed question of law and fact subject to this court's review. *Kerner v. Unemployment Compensation Board of Review,* 68 Pa. Commonwealth Ct. 132, 135, 448 A.2d 666, 668 (1982).

The judicial rule governing the burden of proof, as usually stated, is that, when a claimant's employment is interrupted by a work stoppage arising from a labor dispute, the claimant bears the burden of proving that a lockout caused the stoppage. *Yurick v. Unemployment Compensation Board of Review,* 80 Pa. Commonwealth Ct. 492, 494, 471 A.2d 1300, 1301 (1984). In *Yurick,* the employees stopped work first. However, as *Yurick* acknowledged, such a cessation of work may not constitute a disqualifying strike if a change of status by the employer precipitated it, as was substantially the case in *McKeesport Area*

*School District v. Unemployment Compensation Board of Review,* 40 Pa. Commonwealth Ct. 334, 397 A.2d 458 (1979). *Grzech v. Unemployment Compensation Board of Review,* 56 Pa. Commonwealth Ct. 9, 14, 423 A.2d 1364, 1367 (1981), held that the claimants continue to have the burden when they allege an earlier change of status by the employer.

In this case the company (using the word "lock-out") effectuated a plant closure which, in the company's view, had been precipitated by an in-plant strike. A plant closing, in itself, does not conclusively constitute a lockout. In *Kerner,* the employer sent the workers home after the union had issued a strike notice for the next day; the ultimate decision was that the workers were ineligible for benefits because the strike notice constituted the first alteration of the status quo.

The Pennsylvania Supreme Court has given some emphasis to the prima facie *form* of a work stoppage by emphasizing that word in *Philco Corp. v. Unemployment Compensation Board of Review,* 430 Pa. 101, 242 A.2d 454 (1968), by the statement that "when, as here, the work stoppage takes the *form* of a strike, the burden is upon the union to show that it made the initial 'peace' move by offering to continue the status quo." 430 Pa. at 104, 242 A.2d at 456. Accordingly, should the courts consider shifting of the burden to the employer if, as in this case, the ultimate work stoppage had the *form* of a lockout? Should the employer, as the party who actually closed the plant, have the burden to show that a constructive strike actually precipitated that closing?

Such a doctrine may seem attractive in that it would be analogous to other aspects of unemployment compensation law, as exemplified by the willful misconduct cases, in which the employer's termination of

a claimant's work results in the employer having the burden to establish such misconduct, *Ault v. Unemployment Compensation Board of Review,* 398 Pa. 250, 157 A.2d 375 (1960). The converse analogy, of course, presents itself in voluntary quit cases, where the burden remains upon the claimant to show a compelling cause for his withdrawal from the employment, *Steffy v. Unemployment Compensation Board of Review,* 499 Pa. 367, 453 A.2d 591 (1982).

Although there may be some logic in such a dichotomous approach to burden of proof, the better conclusion appears to be that the literal matter of form or appearance should not govern where the burden of proof rests. Logic also dictates that the burden of proof as to lockout versus strike cannot be left to depend upon which one is ultimately established because such an analysis would obviously involve circular reasoning. Although, in a case such as the present one, the employer clearly has the duty to come forward with evidence tending to show that an in-plant strike preceded the plant closing—as the employer here has done—the claimants, as the moving parties, must continue to bear the burden of proof, in the sense of the burden of persuasion as to the ultimate conclusion in the proceeding. The general principle continues to be that the moving party loses in the event of a tie, as exemplified by our corollary rule that unemployment compensation is denied if the fault for a work stoppage is attributable to both employer and employees. *Toma v. Unemployment Compensation Board of Review,* 4 Pa. Commonwealth Ct. 38, 285 A.2d 201 (1971).

Where, as here, the party with the burden of proof did not prevail below, our review is limited to a determination of whether the board's findings are consistent with each other and with the conclusions of law and can be sustained without a capricious disre-

gard of competent evidence.[2] *High v. Unemployment Compensation Board of Review,* 67 Pa. Commonwealth Ct. 472, 447 A.2d 701 (1982), *aff'd,* 505 Pa. 379, 479 A.2d 967 (1984).

### 2. The Legal Meaning of the Status Quo

To determine whether the board's finding that the claimants first altered the status quo by refusing to perform the overtime work has evidentiary support, we must examine the status as it existed at the expiration of the collective bargaining agreement. In the context of unemployment compensation cases where the collective bargaining agreement has expired, the term " 'status quo' has been defined as the last actual, peaceable and lawful noncontested status which preceded the controversy." *Fairview School District v. Unemployment Compensation Board of Review,* 499 Pa. 539, 544, 454 A.2d 517, 520 (1982).

> In that opinion, the Supreme Court also stated: The underlying rationale for the status quo requirement is that during the interim period between contracts, the employer may continue operations and the employee may continue working, while the parties are free to negotiate on an equal basis in good faith. Maintenance of status quo is merely another way of stating that the parties must continue *the existing relationship in effect at the expiration of the old contract.*

*Id.,* 499 Pa. at 546-47, 454 A.2d at 521 (emphasis added).

---

[2] In unemployment cases, a capricious disregard of competent evidence constitutes disbelief of testimony which someone of ordinary intelligence could not possibly challenge or entertain the slightest doubt as to its truth. *Galla v. Unemployment Compensation Board of Review,* 62 Pa. Commonwealth Ct. 238, 241 n.4, 435 A.2d 1344, 1345 n.4 (1981).

The unusual history of this case compels us to confront the question of whether the all-important "status quo" consisted only of the parties' pre-existing agreement terms or whether the status quo included not only those agreement terms but also the previous *conduct* of the parties under those terms. In *Fairview School District,* above, the Pennsylvania Supreme Court described the status quo as the *existing relationship* at the expiration of the contract. In *Vrotney Unemployment Compensation Case,* 400 Pa. 440, 163 A.2d 91 (1960), the court apparently equated "working . . . under the pre-existing terms and conditions of employment" with maintenance of the "status quo." *Vrotney,* 400 Pa. at 444-45, 163 A.2d at 93-94. As emphasized above, *Philco,* which also related the status quo to the parties' pre-existing contract terms, requires that we look at who first refused to continue *operations* under that status quo, thus involving questions of relative performance under contract terms and not just explicit departures from previous terms to newly stated positions.

As an example of a party attempting unilaterally to impose new agreement terms, we have *Local 730 v. Unemployment Compensation Board of Review,* 505 Pa. 480, 480 A.2d 1000 (1984), in which the Pennsylvania Supreme Court held that an employer's substitution of new employment conditions, even though they appeared to be beneficial rather than detrimental to the employees, constituted a change in the status quo chargeable against the employer. The Supreme Court opinion emphasized the importance of confining the decisional analysis to objective indicia of change and avoiding qualitative considerations, in order to keep the standards easy to apply on the administrative level. The desire of the Supreme Court appears to be that "the administrative units involved

in the compensation eligibility decision . . . have little difficulty in resolving the simple factual question of who first departed from the terms of the expired agreement." *Local 730,* 505 Pa. at 487, 480 A.2d at 1004. The Supreme Court expressed aversion to a rule which would compel the board and this court to "fathom underlying, subjective motivations for a work stoppage" and "thus undermine the clarity and relative predictability" embodied in the *Vrotney* and *Philco* standards. *Local 730,* 505 Pa. at 489, 480 A.2d at 1005.

However, the facts of this case illustrate that, in applying the *Philco* test of who "first refused to continue operations under the status quo," considering that the past history of work under the pre-existing agreement defined the status quo, the board and the courts cannot avoid examining how the parties operated and conducted themselves in relation to those agreement terms. Unfortunately we cannot be assured that we will always have a "simple factual question" in determining "who first departed from the terms of the expired agreement."

Here the working of overtime by employees constituted one aspect of the status quo at the Shiremanstown plant. Employees were, at times, scheduled for overtime on the weekly schedule so that the company could maintain its production plan. Additionally, if requested by a supervisor during their regular shift, employees could stay on after their shift to fill a vacancy in the next shift.

The Overtime Memorandum Update, which governed the details of the overtime system during the lifetime of the collective bargaining agreement, indicates that both sides agreed to meet a recognized need for overtime work by following an approach which

was systematic, albeit voluntary with respect to any particular individual employee.[3]

Whether previously scheduled or asked to remain, employees were permitted to accept the overtime work, or could ask to be excused. Supervisors routinely granted that request. After excusing an employee, the supervisor would move on to another person in the department and would continue until the overtime spot was filled. The voluntary system permitted the company to maintain its production schedule and at the same time gave individual employees the option of either working overtime or declining. Employees testified that, although the company occasionally shut down production lines when no one could be found to fill an overtime spot, the company did not take disciplinary action against declining employees, and did not make overtime mandatory.

Also pertinent are the following provisions of the bargaining agreement:

> The union agrees that during the terms of this agreement there will be no strike of any kind nor concerted slowdown or work stoppage. [Section 2.01.]
>
> . . . .

---

[3] The Overtime Memorandum Update states in pertinent part:

6. Overtime shall be distributed on a reasonably equitable basis between those employees actually working in the classification on Wednesday of that week who also hold seniority in the classification, due consideration being given to production needs, effective operation, employee welfare, etc. . . . .

7. When department management determines that it is necessary to assign overtime to employees other than those described in Paragraph 6 above, due consideration will be given to the relative number of overtime hours accumulated by each employee having departmental seniority and actually working in the department. . . . If it becomes necessary to go beyond this departmental group, any employee may be assigned to perform the overtime work.

> No employee shall participate in any strike,
> concerted slowdown or work stoppage during
> the terms of this agreement. [Section 2.03.]

On April 25, 1979, the company announced its intention to impose a mandatory overtime system effective at 7 a.m. the next day.[4] The company contends that this change was necessary because increasing employee refusals to work overtime had resulted in the company's inability to fill overtime spots, and consequently, inability to maintain the production schedule. By contrast, the claimants contend that this unilateral imposition of mandatory overtime changed the status quo.

However, the board found that the claimants had earlier first altered the status quo by refusing to perform overtime work. If the board made this finding without capriciously disregarding evidence, we must affirm the board's conclusion that the work stoppage was the result of a strike rather than a lockout, thus recognizing the implication that the employees' concerted refusal of overtime precipitated the company's attempt to institute a new, mandatory approach.

The company arrived at a percentage of hours refused by dividing the total number of hours both refused and worked into the number of hours refused. Exhibit 9 in the record details that, for the six-month period under contract between October 1978 and March 1979, an average of 30% of overtime hours were refused.

---

[4] Under the mandatory overtime system, the supervisor would ask the employee with the lowest seniority in the department to accept overtime. If the employee asked to be excused, the supervisor would proceed through the department from lowest to highest seniority until the position was filled. If the supervisor had not filled the position after all employees had been asked, the employee with lowest seniority would be required to accept the overtime or be subject to a three-day suspension.

Exhibit 10 in the record shows that, during the week of April 16-21, after contract expiration the average refusal rate was 56%. Thus, the overtime refusal rate during that week appears to be almost double earlier figures. The week of April 22-29, 1979, illustrated an even more drastic increase in the rate of overtime refusal; on April 24 and 25, the overtime refusal rate was 91% and 97%, respectively.

In slightly different terms, the increase after April 16 in percentage of employees refusing (as distinguished from the percentage of overtime hours refused) is even more noticeable. Seventy-four percent of employees refused overtime between April 16 and April 26. Between April 23 and 26, the refusal rate averaged 97.5%. On April 25, 115 of 116 employees refused overtime. Also, as we noted in *Quaker Oats Company,* the parties' stipulation established that all twenty-seven mechanics who had agreed to work on Saturday, April 21, 1979, later told their supervisors that they wished to be excused, and all unscheduled mechanics contacted by the company refused to work that Saturday.

On April 26, the company closed the plant, determining that normal plant operations could no longer be maintained, as a result of the heightened overtime refusal rate, equipment damage and an apparent work slowdown. The existence of one or more of such problems is consistent with the company's decline in production efficiency after the expiration of the collective bargaining agreement on April 1, 1979. Before the expiration of the agreement, the year-to-date production average was 82.2%. This average is based upon a predetermined standard amount of pounds or cases of product produced by a line during an hour, assuming no downtime on the line during that hour. In the previous nine months the production average

had never fallen below 77%; however, for the ten days of production recorded between April 12-26, the production average was under 69%, declining to a low of 50% efficiency on April 26.

Although several employees testified that they were not involved in a work slowdown, the board did not capriciously disregard competent evidence in reaching a contrary conclusion. Accordingly, we must affirm the board's conclusion that the work stoppage was, in truth, a strike rather than a lockout, thus rendering the claimants ineligible for benefits. *Quaker Oats.*

We need not reach the issue of whether the claimants committed acts of sabotage.

### ORDER

Now, December 17, 1985, the order of the Unemployment Compensation Board of Review, dated August 31, 1982, No. B-183655-B, is affirmed.

---

DISSENTING OPINION BY JUDGE BLATT:

I respectfully dissent.

The majority concludes that, even though employees were routinely granted permission to be excused from overtime work prior to April 25, 1979, their refusals to work overtime during the period here involved constituted a disruption of the status quo. I cannot agree, and would hold that the disruption of the status quo occurred on April 25, 1979 when the employer unilaterally instituted the mandatory overtime policy. Accordingly, under *Philco Corporation v. Unemployment Compensation Board of Review*, 430 Pa. 101, 242 A.2d 454 (1968), I believe that the work stoppage in this case should be considered to have been a lock-out.