549 A.2d 113

**Frank D. MICELI, Charles Minnich and Leander Krist, Token Claimants, Appellants,**

v.

**UNEMPLOYMENT COMPENSATION BOARD OF REVIEW, Commonwealth of Pennsylvania, Appellee,**

and

**Quaker Oats Company, Intervenor.**

Supreme Court of Pennsylvania.

Argued May 10, 1988.

Decided Oct. 17, 1988.

Ira H. Weinstock, Paul J. Dellasega, Gerard M. Mackarevich, Harrisburg, for appellants.

Clifford Blazes, Acting Dep. Chief Counsel, James K. Bradley, Asst. Counsel, for appellee.

C. Grainger Bowman, Harrisburg, Michael Welch, pro hac vice, for intervenor.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, ZAPPALA PAPADAKOS and STOUT, JJ.

## OPINION OF THE COURT

LARSEN, Justice.

Frank D. Miceli, Charles Minnich and Leander Krist, token claimants, appeal from a Commonwealth Court order affirming a decision of the Unemployment Compensation Board of Review (Board) that denied them, and all other similarly situated employees of Intervenor, Quaker Oats Company (Quaker Oats), unemployment compensation benefits. At stake in this appeal is the eligibility of the union employees of Quaker Oats for unemployment compensation

benefits for the weeks ending April 28, 1979 through May 26, 1979. During that time a labor dispute existed between Quaker Oats and the employee's bargaining representative, the Cereal Workers Directly Affiliated Local Union No. 221, AFL–CIO (Union). The Board concluded that the claimants were ineligible for benefits because their unemployment for the relevant period was due to a strike rather than a lockout within the meaning of section 402(d) of the Pennsylvania Unemployment Compensation Law, Act of December 5, 1936, P.L. 2897, as amended, 43 P.S. § 802(d) (1964). The Commonwealth Court reached the same conclusion and affirmed the Board's decision. Thus, we are faced with the question of whether the work stoppage during the period for which benefits are sought was the result of a strike or a lockout. After reviewing the record, we conclude that the work stoppage resulted from a lockout by Quaker Oats leaving the claimants eligible for benefits. We therefore reverse.

## Background

In February, 1979, Quaker Oats and the Union were parties to two collective bargaining agreements. Together these agreements covered approximately 375 hourly production, maintenance, shipping and laboratory employees at the Quaker Oats production and distribution facilities in Shiremanstown, Pennsylvania. One of these agreements was due to expire on March 31, 1979 and the other on April 1, 1979. Negotiations for a new collective bargaining agreement to replace the two agreements began in late February, 1979. Although the parties met at various times in February and March, they were unable to reach a new agreement before the existing ones expired.

On April 2, 1979, the Union and Quaker Oats signed a memorandum of agreement providing that the plant would remain open and the parties would continue to work under the terms and conditions of the expired agreements while negotiations continued. The memorandum of agreement provided further that the Union would not strike and Quak-

er Oats would not lock out the employees without 24 hours prior written notice to the other side. Quaker Oats and the Union continued negotiations and met in negotiating sessions on April 5, 9 and 17. No progress toward a new agreement was made at these sessions. On April 20 the parties met and Quaker Oats informed the Union that many of the employees were refusing to work overtime and if the refusals continued it would cause severe production problems in the plant. The Union indicated that it was unaware of any such problem and agreed to actively urge its members to accept overtime work. The Union carried out its promise in this regard. On April 25, 1979, Quaker Oats and the Union held another bargaining session. At this meeting Quaker Oats raised questions concerning, (1) the employees refusal to work overtime, (2) an alleged concerted work slowdown by the employees and (3) incidents of alleged sabotage of equipment in the plant. On April 26, 1979, Quaker Oats delivered written notice to the Union that all employees represented by the Union would be locked out effective 7:00 o'clock a.m., April 28, 1979. Quaker Oats rejected the Union's unconditional offer to continue to work and, in so doing, stated: "At this time we have no reason to expect that normal operations could be resumed should the plant be reopened." (R.R. p. 253a.)

The claimants, idled by the work stoppage, sought unemployment compensation benefits. Their applications were approved by the Office of Employment Security. Quaker Oats appealed and obtained a hearing. On August 23, 1979, the appeal was heard by a referee. In a decision handed down November 20, 1979, the referee affirmed the determination of the Office of Employment Security allowing benefits. On appeal to the Board the referee's decision was affirmed. On further appeal, the Commonwealth Court found that the referee's decision lacked findings of fact needed to support its conclusion. The Commonwealth Court therefore reversed and remanded for additional findings of fact. *Quaker Oats Co. v. Unemployment Compensation Board of Review*, 65 Pa.Cmwlth. 72, 442 A.2d 369 (1982).

Pursuant to the remand the Board vacated its previous order that approved benefits for the claimants and went on to find: "The claimants first altered the status quo by refusing to perform overtime work and by causing instances of sabotage to the employer's equipment." The Board concluded that the work stoppage was a strike rather than a lockout. Accordingly, the Board reversed the decision of the referee and denied unemployment benefits. The claimants appealed the Board's decision to the Commonwealth Court which affirmed. *Miceli v. Unemployment Compensation Board of Review*, 93 Pa.Cmwlth. 505, 502 A.2d 297 (1985). We granted the claimants' petition for allowance of appeal.

## I.

The scope of review in an appeal from an adjudication of a Commonwealth agency is that we must affirm unless the adjudication violates the constitutional rights of the appellant, or is contrary to law, or that agency procedure was violated, or a finding of fact necessary to back the decision is not supported by substantial evidence. 2 Pa.C.S.A. § 704. *See: Estate of McGovern v. State Employees' Retirement Board*, 512 Pa. 377, 517 A.2d 523 (1986). *See also, Taylor v. Unemployment Compensation Review Board*, 40 Pa.Cmwlth. 577, 398 A.2d 231 (1979).

The claimants make no claim that their constitutional rights were violated nor do they raise any question concerning the procedure before the Board. Our review therefore will be limited to whether there was an error of law and/or whether the Board's findings are supported by substantial evidence.

## II.

Section 402(d) of the Pennsylvania Unemployment Compensation Law provides in relevant part as follows:

An employe shall be ineligible for compensation for any week—

(d) In which his unemployment is due to a stoppage of work, which exists because of a labor dispute (other than a lockout) at the factory, establishment or other premises at which he is or was last employed: ....

43 P.S. § 802(d) (1964).

The claimants' eligibility for benefits is dependent upon a determination of whether the work stoppage was caused by a lockout or a strike. If the work stoppage was caused by a lockout, as initially found by the referee and affirmed by the Board, the claimants are eligible for benefits. If, however, the work stoppage was the result of a strike, as was later found by the Board after remand and affirmed by the Commonwealth Court, then claimants are ineligible for benefits.

In *Vrotney Unemployment Compensation Case,* 400 Pa. 440, 163 A.2d 91 (1960) we adopted a test to distinguish between a strike and a lockout for purposes of unemployment compensation benefits.

"Have the employees offered to continue working for a reasonable time under the pre-existing terms and conditions of employment so as to avert a work stoppage pending the final settlement of the contract negotiations; and has the employer agreed to permit work to continue for a reasonable time under the pre-existing terms and conditions of employment pending further negotiations? If the employer refuses to so extend the expiring contract and maintain the status quo, then the resulting work stoppage constitutes a 'lockout' and the disqualification for unemployment compensation benefits in the case of 'stoppage of work because of a labor dispute' does not apply."

*Id.,* 400 Pa. at 444–45, 163 A.2d at 93–94. The test announced in *Vrotney* is uniformly applied in unemployment compensation cases where a labor dispute has resulted in a work stoppage. *Local 730 v. Unemployment Compensation Board of Review,* 505 Pa. 480, 480 A.2d 1000 (1984); *Fairview School District v. Unemployment Compensation Board of Review,* 499 Pa. 539, 454 A.2d 517 (1982);

*Unemployment Compensation Board of Review v. Sun Oil Company*, 476 Pa. 589, 383 A.2d 519 (1978); *Philco Corporation v. Unemployment Compensation Board of Review*, 430 Pa. 101, 242 A.2d 454 (1968). *See also: Norwin School District v. Belan*, 510 Pa. 255, 507 A.2d 373 (1986) (plurality opinion), and *High v. Unemployment Compensation Board of Review*, 505 Pa. 379, 479 A.2d 967 (1984) (dissenting opinion, Larsen, J.). This well-established test is designed to answer the crucial question: who bears the responsibility for the work stoppage. If responsibility rests with labor then the stoppage is a strike. On the other hand, if management bears responsibility, then the stoppage is a lockout. The idled employees' eligibility for unemployment compensation benefits depends upon the resolution of this question.

In *Philco Corporation v. Unemployment Compensation Board of Review, supra.*, we refined the test to fix responsibility for a work stoppage and distinguish between a strike and a lockout for purposes of unemployment compensation benefits. We there said:

> This is but another of those troublesome areas where the legal test as distilled from previous cases is easy to verbalize, but most difficult to apply to any given set of facts. Since the purpose of our unemployment compensation system is to compensate an individual when work has been denied him through no fault of his own, logically the test of whether a work stoppage resulted from a strike or a lock-out requires us to determine which side, union or management, first refused to continue operations under the status quo after the contract had technically expired, but while negotiations were continuing.

*Id.*, 430 Pa. at 103, 242 A.2d at 455. "The status quo has been defined as the last actual, peaceable and lawful, noncontested status which preceded the controversy." *Fairview School District v. Unemployment Compensation Board of Review*, 449 Pa. at 544, 454 A.2d at 520 citing: *Valley Forge Historical Society v. Washington Memorial Chapel*, 493 Pa. 491, 426 A.2d 1123 (1981); *Commonwealth*

*v. Coward,* 489 Pa. 327, 414 A.2d 91 (1980); *Roberts v. School District of Scranton,* 462 Pa. 464, 341 A.2d 475 (1975). Thus, the question in this case is: was it the Union or Quaker Oats who first refused to continue operations under the last actual peaceable and lawful uncontested status that preceded the work stoppage? As the Commonwealth Court opinion correctly observes, "The question of whether the work stoppage resulted from a strike or lockout is a mixed question of law and fact subject to this Court's review." *Miceli v. Unemployment Compensation Board of Review, Supra,* 502 A.2d at 299 citing *Kerner v. Unemployment Compensation Board of Review,* 68 Pa. Cmwlth. 132, 135, 448 A.2d 666, 668 (1982). *See also Philco Corporation v. Unemployment Compensation Board of Review, supra.*

The claimants argue that the work stoppage was the result of a lockout in that it was Quaker Oats who first refused to continue operations under the status quo by unilaterally instituting mandatory overtime.[1] The claimants contend that the Board erred in finding that "the claimants first altered the status quo by refusing to perform overtime work and by causing instances of sabotage to the employer's equipment." (Finding of Fact No. 12, Board Decision of August 31, 1982.) Further, the claimants argue that the Board erred in finding that the work stoppage was a strike rather than a lockout. (Finding of Fact No. 13, Board Decision of August 31, 1982.)

## III.

In *Philco Corporation v. Unemployment Compensation Board of Review, supra.,* we had occasion to consider the burden of proof in unemployment compensation cases involving a work stoppage, where we said: "When . . . the work stoppage takes the form of a strike,

---

1. Mr. Jim McConnaugday, personnel manager of Quaker Oats testified that as of 7:00 p.m. on April 26, 1979, the "employees would be *required* to work reasonable overtime hours, and that refusal to work the required overtime hours would result in their receiving disciplinary action in the form of a three-day suspension." (R.R. p. 48a.)

the burden is upon the union to show that it made the initial 'peace' move by offering to continue the status quo." 430 Pa. at 104, 242 A.2d at 456. Thus, where the Union membership votes to withhold services and the work stoppage is in the nature of a strike, claimants have the burden of showing that it was the employer who first refused to continue under the status quo. If such proof is produced, the withholding of services would not disqualify them for benefits. Conversely, where, as here, the work stoppage takes the form of a lockout, the burden is upon the employer to show that it was the claimants who first refused to continue operations under the status quo. It is logical and fair that the burden of proof be on the employer when the employer has locked out the employees. After all, in such a case, it is the employer who took the action that caused the work stoppage. If there is an explanation of that action involving evidence that the employer's act was preceded by a refusal on the part of labor to maintain the status quo, then it is the employer's burden to produce such evidence. The claimants should not be made to prove the negative of that proposition.

Placing the burden on the employer when it is an act of the employer that causes a change in the existing employment relationship or situation is not unusual and is consistent with the burden of proof allocations in proceedings involving other unemployment compensation issues. For example, when a claimant has been fired for willful misconduct, it is the employer who has the burden of proving such misconduct. *See McLean v. Unemployment Compensation Board of Review*, 476 Pa. 617, 383 A.2d 533 (1978); *Ault Unemployment Compensation Case*, 398 Pa. 250, 157 A.2d 375 (1960). On the other hand, where the claimant has voluntarily quit his employment, the claimant has the burden of proving that he quit for necessitous and compelling reasons. *Steffy v. Unemployment Compensation Board of Review*, 499 Pa. 367, 453 A.2d 591 (1982); *Taylor v. Unemployment Compensation Board of Review*, 474 Pa. 351, 378 A.2d 829 (1977). The Commonwealth Court opinion acknowledges that under *Philco,* the burden of proof rests

with the claimants when the work stoppage is in the form of a strike. That opinion also acknowledges the difference in the burden of proof allocations in willful misconduct cases as opposed to voluntary quit cases. The Commonwealth Court nonetheless goes on to hold that in cases such as this one, the burden of proof is on the claimants no matter the form of the work stoppage. We believe that approach is incongrous and therefore we reject it.

Where the employer locks out the employees and then claims that the lockout was preceded by an in-plant strike, as Quaker Oats asserts here, the Commonwealth Court would require no proof of such assertion on the part of the employer. On the contrary, under the Commonwealth Court holding, the claimants would be required to prove that no in-plant strike took place as alleged by the employer. Requiring the claimants to prove a negative in these circumstances is not a sound approach. If the employees refused to continue working under the status quo prior to the lockout, then it is up to Quaker Oats to prove such refusal by substantial evidence in order to disqualify the claimants for benefits.

## IV.

Having concluded that because the work stoppage took the form of a lockout the burden of proof rested with Quaker Oats, we now move on to consider whether that burden was satisfied. To meet its burden Quaker Oats was required to show that it was the Union who initially refused to continue operations under the status quo. Quaker Oats argues that the claimants first altered the status quo by refusing to work overtime, by engaging in acts of sabotage and by commencing a concerted work slowdown, all of which amount to an in-plant strike.

In the Board's decision after remand, it made thirteen findings of fact. The first ten findings are identical to the first ten findings of the referee which need not be repeated here. Findings nos. 11, 12 and 13 of the Board state as follows:

11. "The work stoppage began on April 26, 1979." [2]

12. "The claimants first altered the status quo by refusing to perform overtime work and by causing instances of sabotage to the employer's equipment."

13. "The work stoppage affecting the claimants was a strike rather than a lockout."

It is findings 12 and 13 that are disputed by the claimants and thus the question is: are the Board's findings that the claimants first altered the status quo, and that the work stoppage was a strike rather than a lockout supported by substantial evidence?

First, we note that the Board made no finding that the claimants initiated a concerted work slowdown. Upon the record, we agree that no such finding could be justified.

Next, we consider the finding that the claimants altered the status quo by refusing to work overtime. In order to support the finding, the evidence must establish that under the status quo, refusal of overtime work was not permitted. In other words, it must be shown that required overtime work was part of the pre-existing terms and conditions of employment under the expired bargaining agreements. Clearly, this is not the case. The expired agreements provide for voluntary overtime work which the individual employees were free to accept or decline. The fact that during the month of April, 1979, more of the employees than usual exercised their right to refuse overtime work does not establish an alteration of the status quo on the part of the claimants. The status quo was that the employees had the freedom to accept or reject overtime work. The claimants were operating within that status quo when overtime work was refused during April, 1979 even though the rate of refusal was higher than usually experienced.

The Commonwealth Court, in affirming the Board's finding that the claimants altered the status quo by refusing

2. The referee's Finding of Fact No. 11 is as follows:
"On April 26, 1979, following the bargaining session, the company gave written notice to the union of its intent to lock out employees represented by Cereal Workers, D.A.L.U. Local 221, AFL–CIO, effective 7:00 p.m., April 28, 1979."

overtime work, concluded that the status quo consisted not only of the terms and conditions of employment under the expired agreements, but also the previous conduct of the parties. Our opinions in *Vrotney* and *Philco* limited the status quo to the pre-existing terms and conditions of employment which, as here, are embodied in the expired agreement. The Commonwealth Court's departure from this relatively clear and simple rule was error. The Commonwealth Court said: "[T]he working of overtime by employees constituted one aspect of the status quo ..." We disagree. The pre-existing terms and conditions of employment provided for voluntary overtime work that could be accepted or declined by the individual employees. Nothing more may be required of them when the agreement expires. The Commonwealth Court in focusing on the amount of the overtime hours refused prior to the contract expiration as compared to the overtime refusal rate during the month of April after the contract expired introduced a new factor that never was part of the status quo. Observing that the refusal rate was higher in April than at previous times, the Commonwealth Court concluded that this amounted to an alteration of the status quo by the employees. Because under the terms and conditions of the expired contract overtime work was not required, that conclusion is in error. Furthermore, condoning a rule that would require courts to consider factors other than the previous terms and conditions of employment would only complicate the issue and is contrary to our policy to keep the standards regarding disruption of the status quo easy to apply on the administrative level.[3] *Local 730, supra.* 505 Pa. at 489, 480 A.2d at 1005. Based upon the evidence that under the pre-existing terms and conditions of employment overtime work was

3. If the status quo were to include the percentage of overtime hours refused by the employees prior to the expiration of the contract, then, among other things, it should also include: the amount or quantity of overtime hours offered by Quaker Oats; the kind or type of overtime work offered by Quaker Oats; the times when overtime work was offered by Quaker Oats; etc. Obviously, this expanded definition of the status quo would destroy the simple standard we have followed since *Vrotney* and *Philco*. The status quo consists of the previous terms and conditions of employment, nothing more, nothing less.

entirely voluntary, it was Quaker Oats, who in this case, first altered the status quo by instituting mandatory overtime.

Lastly, we consider the finding that the claimants altered the status quo by acts of sabotage. Originally the referee found "there was insufficient evidence to prove the employer's charge" as to the sabotaging of equipment. On appeal the Board agreed with that finding. On remand, without any additional evidence being presented, the Board reversed itself, and the referee, and found that the claimants altered the status quo by acts of sabotage toward Quaker Oats' equipment. We have reviewed the entire record and conclude that the referee's initial finding that there was insufficient evidence to establish sabotage was correct.

No evidence was presented as to the identity of even one employee who committed any act of sabotage. No one was disciplined or even charged with any such act. Quaker Oats points to machinery mishaps and production delays following the expiration of the contract as sabotage. The parties stipulated that production delays and machinery breakdowns occurred at times prior to the contract expiration. Further, at the times of the alleged acts of sabotage, management personnel were present in the plant. Also present were outside independent contractors and their employees. Quaker Oats merely presented a summary of various instances of mechanical failure, equipment malfunction and production delays that occurred during April, 1979 along with its bare opinion that those instances constituted sabotage. The Board's finding of sabotage based the instances of mechanical failure, equipment malfunction and production delays, and Quaker Oats' opinion is not supported by substantial evidence.

The order of the Commonwealth Court is reversed and the order of the referee allowing benefits is reinstated.

PAPADAKOS and STOUT, JJ., join in this majority opinion.

528

FLAHERTY, J., joins in this majority opinion and files a concurring opinion.

NIX, C.J., and McDERMOTT, and ZAPPALA, JJ., file concurring opinions.

FLAHERTY, Justice, concurring.

I join the majority, but write separately to further address the question of whether sabotage was adequately shown to have occurred in the Quaker Oats Company manufacturing facilities. Although the record comes close to providing sufficient support for the Board's finding of sabotage, I agree with the majority that, under the substantial evidence standard, it falls short of the proof required.

Our majority opinion is not to be construed, however, as requiring proof of the identity of particular employees who committed acts of sabotage, as proof of the identity of individual saboteurs is not necessary to establish that sabotage has in fact occurred. By its very nature, sabotage is committed in a surreptitious manner, and virtually never committed openly for management to observe. Further, employees are understandably reluctant to identify saboteurs, due to the fear of reprisals from co-workers. Management is justified in closing a facility when its operations are being subverted by employees, regardless of whether the particular employees responsible therefor can be identified.

The Quaker Oats Company argued, with regard to the alleged suspicious incidents of sabotage, that it is very "unlikely" that they were caused by normal machine breakdowns, considering the frequency at which they occurred during the relevant time frame. If testimony had been presented to compare the exact frequency of breakdowns with that found before the labor difficulties arose, or if testimony had established with greater certainty the causes of certain breakdowns, a contrary decision by this Court would be warranted.

NIX, Chief Justice, concurring.

Under section 402(d), the ineligibility for compensation due to unemployment is clearly established, *see*, 43 P.S. 802(d) (1964). The genius of the test established in *Vrotney Unemployment Compensation Case* (*"Vrotney "*), 400 Pa. 440, 163 A.2d 91 (1960), was its simplicity in application. In any period of turmoil, particularly where the setting is a labor dispute between employees and employers, it is impossible during the heat of the moment to ascertain who is right and who is wrong, who was the provoker and who was the victim. Therefore, in *Vrotney*, the simple test articulated was to determine which side occasioned the work stoppage. If it was a lockout, the employer was properly assigned as the person responsible for the cessation of the operation. Conversely, if it was a strike, the Union was held responsible.

Admittedly there are many factors that may bear upon an employer's decision to terminate the operations through a lockout. There are also weighty reasons that may force the Union to conclude that a strike is necessary. However, to incorporate these considerations in a determination under the *Vrotney* rule as it applies to unemployment compensation benefits destroys the utility of that vehicle as a means for providing the implementation of section 402(d). In this instance the employer unquestionably created the cessation of work by electing to cause a lockout.[1] The inquiry for

1. The fundamental error in the Opinion of the Court is its failure to distinguish between instances where the issue is whether the work stoppage resulted from a strike or a lockout, *see, e.g., Local 730 v. Unemployment Compensation Board of Review,* 505 Pa. 480, 480 A.2d 1000 (1984); *Fairview School District v. Unemployment Compensation Board of Review,* 499 Pa. 539, 454 A.2d 517 (1982); *Union City School District v. Unemployment Compensation Board of Review,* 499 Pa. 548, 454 A.2d 522 (1982), and this case where it is conceded that the cause of the work stoppage was a lockout. In those cases where the issue centers upon the nature of the work stoppage, it is legitimate to inquire into the motives of the respective sides in determining the character of the work stoppage. In this case, the Opinion seeks to establish the dangerous precedent of introducing into the *Vrotney* formula the justification, or lack of it, for a lockout and suggests its relevance in the ultimate determination as to the entitlement of the employees to unemployment compensation benefits. Once it is deter-

determination of benefits for employees should have stopped at that point. For this reason I can concur in the result reached today.

Nevertheless, I register a serious concern about the rationale applied by the majority, even though the ultimate result, I believe, is correct. The majority has taken the simple question of fact, *i.e.*, whether there was a lockout or a strike, and transformed it into a mixed question of fact and law that can only further disrupt an area where disruption is at all costs to be avoided. The attempt to allow the employer, where there is a lockout, or the union, where there is a strike, to justify that lockout or strike under the terms of 402(d) is totally unwarranted. For the purposes of applying section 402(d), the question is not the legitimacy of the employer's judgment in effecting a lockout, or the union's justification in declaring a strike. These concerns can be properly addressed under grievance procedures and in the bargaining process.[2] The intent of *Vrotney* was to

mined that the resulting work stoppage was a result of a strike or a lockout, any further inquiry as to why the particular side acted in such a manner is irrelevant.

**2.** In *Local 730 v. Unemployment Compensation Board of Review*, 505 Pa. 480, 480 A.2d 1000 (1984), the employer asserted its good faith to justify its unilateral change in wages during a collective bargaining impasse. In rejecting the relevancy of that argument, we stated the following:

> The effect of the latter argument is to interject a good faith element in the *Vrotney* formula. The initial acceptance of the *Vrotney* standard was based on its easy application on the administrative level and at the same time it served the basic policy concerns involved. *Vrotney* was designed to encourage the continuation of the work relationship under terms previously agreed to by the parties during that difficult period between the expiration of the old agreement and before the new terms of employment had been agreed upon.... Moreover, the administrative units involved in the compensation eligibility decision would have little difficulty in resolving the simple factual question of who first departed from the terms of the expired agreement.... Once we complicate that decision with requirements of ascertaining the good faith or the justification of a party altering the former terms, we create a standard infinitely more difficult to administer, without a corresponding benefit being derived for such a modification.

505 Pa. at 486–87, 480 A.2d at 1003–04 (Citations omitted).
That teaching applies where either party seeks to justify its action in bringing about a work stoppage.

extricate the determination of benefits from the heat of the labor controversy that provided the basis for the dispute. Today's opinion inextricably ties an employee's entitlement to benefits to the merits of the labor controversy.

Section 402(d) was designed to encourage both sides to continue the working relationship in the face of serious disagreements relating to the conditions of employment. The resolution of these disagreements ideally should come through the bargaining process without the disruption of a work stoppage. Attempting to deter the employer from instituting a lockout or the union from calling a strike, regardless of the differences that may exist between the parties, furthers the purpose of the Act. Rule 402(d) was designed to perpetuate the existing working conditions during the period of an impasse. That simple test was established to determine whether the status quo was broken and by whom. Today we undermine that simple approach, and in my judgment, detract from *Vrotney* a significant part of its efficacy.

McDERMOTT, Justice, concurring.

I agree with the opinion of Mr. Justice Zappala that the burden of proving a lockout is upon the proponent of that claim. Additionally, I agree with that part of the opinion of Mr. Justice Flaherty which states that where sabotage is alleged its proof is not dependent exclusively upon identification of individual saboteurs, but may be predicated upon the totality of the circumstances.

ZAPPALA, Justice, concurring.

I agree with the result reached by the majority, but write separately because of my concern that the requisite burden of proof in questions of determining the eligibility of a claimant for unemployment compensation may be confused as a result of the majority's opinion.

In *Philco Corporation v. Unemployment Compensation Board of Review*, 430 Pa. 101, 242 A.2d 454 (1968), we stated:

Since the purpose of our unemployment compensation system is to compensate an individual when work has been denied him through no fault of his own, logically the test of whether a work stoppage resulted from the strike or lock-out requires us to determine which side, union or management first refused to continue operations under the status quo after the contract had technically expired, but while negotiations were continuing.

430 Pa. at 103, 242 A.2d at 455.

This analysis requires the factfinder to determine from the factual circumstances presented which side bore the initial responsibility for the refusal to continue operations during negotiations. It should not be interpreted, however, to require an employer to establish in the first instance that its activities did not result from a lockout. The burden of proof of establishing eligibility for benefits rests with the claimant. Upon presentation of sufficient evidence to indicate that the work stoppage resulted from a lockout, the burden of persuasion may shift to an employer, but the burden is not placed upon the employer in the first instance. To the extent that the majority opinion may be interpreted otherwise, I must disagree.

McDERMOTT, J., joins in this concurring opinion.