**NORTHERN HEALTH FACILITIES
d/b/a Broad Mountain Nursing
Center, Petitioner,**

v.

**UNEMPLOYMENT COMPENSATION
BOARD OF REVIEW,
Respondent.**

Commonwealth Court of Pennsylvania.

Argued April 4, 1995.

Decided July 31, 1995.

Vincent Candiello, for petitioner.

Linda S. Lloyd, for respondent.

Before DOYLE and SMITH, JJ., and SILVESTRI, Senior Judge.

DOYLE, Judge.

Before the Court is the appeal of Northern Health Facilities d/b/a the Broad Mountain Nursing Center (Employer) from an order of the Unemployment Compensation Board of Review which granted unemployment benefits to Mary P. Ayello, Theresa Pletnick, and Dawn M. Zanuck, as representative claimants (collectively, Claimants) of the employees of Employer.

The Board made the following findings of fact. Claimants, worked under a collective bargaining agreement with Employer, which expired on June 1, 1992.[1] Prior to the expiration of the agreement, Employer and the National Union of Hospital and Health Care Employees, District 1199P, were negotiating a new agreement, but were not able to reach a settlement by June 1, 1992. Nevertheless, Claimants continued to work. On February 11, 1993, the Union initiated a work stoppage at the nursing home and established and maintained picket lines.[2] The Board found that on February 11, 1993, when the work stoppage began, continuing work was available to Claimants.

Employer took steps to hire replacement employees so as not to compromise the care given to residents of the nursing home. The Board specifically made the following findings concerning replacement employees:

10. On February 11, 1993, an authorized spokesman for the employer held a press conference at which he advised those present that "we are hiring permanent replacement workers."

11. The employer began running classified advertisements in the local paper commencing on February 22, 1993 which read, in part, "A labor dispute is in progress and workers are needed as permanent replacements for economic strikers...."

12. Newspaper articles relating information about the work stoppage and re-

placement workers appeared in local newspapers during this time.

13. The employer did not advise workers involved in the work stoppage that although permanent replacement workers were being hired, that work was still available to them.

14. The striking employees and their representatives involved in the work stoppage believed that they had been permanently replaced by the employer.

15. The striking employees observed other people going in and out of the facility and were told by these people that they had their jobs now.

16. The employer never retracted its statements or ceased actions which commenced on February 11, 1993, regarding permanent replacement workers.

17. The employer hired permanent replacement workers to do the work of those engaged in the work stoppage commencing on February 12, 1993.

18. The employer refused to identify which employees it was replacing until the economic issues giving rise to the work stoppage were settled or until the Union made an unconditional offer to return under the terms and conditions of the old contract.

19. Commencing February 12, 1993, continuing work was not available to the individuals involved in the subject work stoppage.

20. Subsequent to the settlement of the economic issues involved in the work stoppage, the employer agreed to negotiate a return to work agreement relative to the individuals involved in the work stoppage.

21. Employees hired by the employer as permanent replacements of individuals involved in the work stoppage were advised by the employer that it intended to

1. Apparently, Dawn M. Zanuck had not been employed long enough to be a member of the Union covered by the collective bargaining agreement. However, Employer does not challenge her eligibility on that basis. *See Norwin School District v. Belan*, 510 Pa. 255, 507 A.2d 373 (1986) (employees who are not formally covered by a collective bargaining agreement but

participate in lawful concerted activity are nevertheless entitled to the same unemployment benefits as their represented counterparts).

2. The Union complied with all applicable federal laws concerning notice of the impending work stoppage to Employer.

enter into a long-term employment relationship with them.

22. Most (but not all) permanent replacements that were hired by the employer were required to sign an agreement which, in part, indicated that the individuals understood that their long-term employment may be affected by the outcome of labor negotiations with the National Union of Hospital and Health Care Employees, District 1199P.

(Findings of Fact Nos. 10–22.)

By May 28, 1993, the parties reached a tentative settlement, and, as part of that agreement, Employer waived its right to hire permanent replacements and agreed to return Claimants' to their prior jobs. The work stoppage continued, however, until the ratification of the new labor contract between the parties on June 2, 1993.

Claimants applied for unemployment benefits, which were granted by the Job Center. Employer appealed, and, following that appeal Claimants voluntarily entered into a representative appeal agreement on November 4, 1993. The referee affirmed the determination of the Job Center, and held that Claimants were ineligible for benefits for the week ending February 13, 1993, because of the work stoppage. However, the referee also held that Claimants were entitled to benefits for the weeks ending February 20, 1993, through June 5, 1993, because they had been permanently replaced. The Board affirmed and this appeal followed.

■ Employer argues that (1) Claimants failed to sustain their burden of proving that they had been permanently replaced; and (2) Employer sustained its burden of proving that continuing work was available to Claimants and, therefore, benefits should have been denied.

Section 402(d) of the Law provides:[3]

An employe shall be ineligible for compensation for any week—

....

(d) In which his unemployment is due to a stoppage of work, which exists because of a labor dispute (other than a lock-out) at the factory, establishment or other premises at which he is or was last employed....

The issues raised in this appeal invoke the principle interpreting Section 402(d) of the Law enunciated by this Court, and recently affirmed by the Supreme Court, in *Canonsburg General Hospital v. Unemployment Compensation Board of Review*, 156 Pa.Commonwealth Ct. 533, 628 A.2d 503 (1993), *affirmed*, 540 Pa. 531, 658 A.2d 790 (113 M.D.Appeal Dkt. 1994, filed May 19, 1995) (per curiam). In that case we held that in a labor dispute,

where an employer hires *permanent* replacement employees, absent any evidence in the record and pertinent findings thereon that continuing work remains available to the striking workers, the case must be considered as one whether the employment relationship has been severed.... We further make it clear that the burden is upon the employer to show that it advised the striking employees that despite the hiring of permanent replacements work was still available to them....

*Id.* at 547–48, 628 A.2d at 510 (emphasis in original). The rationale for this holding is obvious: when an employer hires permanent replacements for striking employees, the employer is not only changing the status quo, it is severing the employment relationship. Thus, a claimant's loss of employment is no longer caused by his or her decision to participate in a strike, but is the result of an employer's constructive discharge of the claimant from employment. We are invited by the facts of this case to refine our holding in *Canonsburg Hospital*.

Employer first contends that it is Claimants' burden to prove that the replacement workers who were hired were permanent replacement workers.

During the hearings in this case, Claimants proffered evidence of public statements

3. *Un*employment Compensation Law (Law), Act of December 5, 1936, Second Ex.Sess., P.L. (1937) 2897, *as amended*, 43 P.S. § 802(d).

and representations made by Employer through its representatives, where Employer deliberately gave the impression that it was hiring permanent replacements. It is evident that Employer went to great lengths to avoid directly informing the Union of its intention to hire or not to hire permanent, as opposed to temporary, replacements.

■ The first and most telling piece of evidence is the statement made during a press conference on February 11, 1993, by Employer's public relations spokesperson, Michael P. Mervis,[4] wherein he stated that "[w]e are hiring permanent replacement workers as of this moment." The statement of Mr. Mervis was introduced from the testimony of a newspaper reporter who attended the press conference, and the introduction of his and several other news reports that repeated the statement.

Claimant also submitted a "Help Wanted" advertisement from the local paper which stated that Employer was looking for "permanent replacements." Employer contends that this evidence is hearsay and should not have been admitted or considered by the referee.

It has often been stated that hearsay is an out-of-court statement offered to prove the truth of the matter asserted. Leonard Packel & Anne Bowen Poulin, *Pennsylvania Evidence* § 801 (1987). However, the article and the classified ad were only introduced to bolster the Union's position that Claimants reasonably believed that they had be permanently replaced. "The hearsay rule has no application where the question is whether things were said or written by a third person and not whether they are true." *Commonwealth v. Jacobs*, 445 Pa. 364, 367, 284 A.2d 717, 719 (1971), *cert. denied*, 409 U.S. 856, 93 S.Ct. 135, 34 L.Ed.2d 100 (1972). Mr. Mervis's statement and the "Help Wanted" advertisement, are admissible to prove the impression that was given to the Union by Employer indirectly, that Employer was hiring permanent replacements. Thus these exhibits were not hearsay.

■ Even if they were hearsay, Claimants argue that his statements are admissible as an exception to the hearsay rule as representative admissions. We have to agree.

We have held that "statements made by an agent, employee or other representative of a party to the litigation are admissible as evidence if the representative had express or implied authority to make them." *Brady v. Unemployment Compensation Board of Review*, 115 Pa.Commonwealth Ct. 221, 226, 539 A.2d 936, 939 (1988). Such statements must be against the interests of the party. *Id.* We have additionally held that such statements are admissible where the party had an opportunity to explain why and under what circumstances such statements were made. *Estate of Fells v. Unemployment Compensation Board of Review*, 160 Pa.Commonwealth Ct. 493, 635 A.2d 666 (1993), *petition for allowance of appeal denied*, 538 Pa. 651, 647 A.2d 905 (1994) (statements of the claimant's doctor written in a report were admissible); *Dorsey v. Unemployment Compensation Board of Review*, 41 Pa.Commonwealth Ct. 479, 399 A.2d 809 (1979) (doctor's written certification that the claimant could not work because of her pregnancy was admissible because she had an opportunity to detail the facts surrounding the submission and preparation of the report).

Employer has not argued, nor does any evidence suggest, that Mr. Mervis was not authorized to make the statements, or that he misstated Employer's position. In fact, a letter from Employer's attorney, William J. Flannery to the President of the Union, John August (hereinafter "Flannery letter."), stated that "Michael Mervis correctly stated the position of the Company in his statement of February 11, 1993...." (Employer Exhibit 2; Reproduced Record at 177a.) There was significant testimony on the record from both witnesses for Claimant and Employer, that this letter represented Employer's position concerning permanent replacements. Since the statements were made in a public speech given for the benefit of members of the press, we find that they possess sufficient indicia of reliability to fall into the hearsay exception. The Board's conclusion that

4. Mr. Mervis is actually a spokesperson for Unicare, the parent corporation of Broad Mountain.

Claimants were permanently replaced was supported by substantial evidence.

■ Finally, there was also evidence on the record that the Union repeatedly attempted to elicit from Employer information concerning replacements who were being hired. Employer, however, repeatedly refused to discuss replacements, making such negotiations contingent upon the Union's agreement to return to work. Employer instead referred the Union to the Flannery letter as a statement of its position concerning replacements, and would not identify which, if any, employees were permanently replaced or discuss the matter further.

We find that Employer used every means available to deliberately avoid directly informing the Union that permanent replacements were being hired, but went to similar great lengths to give such an impression indirectly. We note the language of the Supreme Court in *Hoffman v. Unemployment Compensation Board of Review*, 524 Pa. 470, 484, 574 A.2d 57, 63–64 (1990):

> When a work force is on strike and a plant operation is shut down, it is not in the interest of the worker, the company or society to have each side posturing for position. We do not favor gamesmanship in labor negotiations. It is essential that all parties approach negotiations with proper motives and deal with each other in good faith.

It is obvious, viewing all the evidence as a whole, that the Board was correct to conclude that Employer had severed its relationship with Claimants and that Claimants had a substantial and reasonable basis to believe that Employer had hired permanent replacements. Moreover, Employer failed to inform the Union, either directly or indirectly, that work was available, as it is required to do under *Canonsburg Hospital.*

Employer argues that it is unfair to require it to prove a negative, that is, that the replacements were not permanent. We disagree, and find to the contrary: it would be fundamentally unfair to require Claimants to prove that replacements hired by Employer were permanent and not temporary, when Employer is in the superior position to provide this information. Placing such a burden

on Employer is consistent with the Supreme Court's holding in *Miceli v. Unemployment Compensation Board of Review*, 519 Pa. 515, 549 A.2d 113 (1988):

> Placing the burden on the employer when it is an act of the employer that causes a change in the existing employment relationship or situation is not unusual and is consistent with the burden of proof allocations in proceedings involving other unemployment compensation issues. For example, when a claimant has been fired for willful misconduct, it is the employer who has the burden of proving such misconduct. On the other hand, where the claimant has voluntarily quit his employment, the claimant has the burden of proving that he quit for necessitous and compelling reasons.

*Id.* at 523, 549 A.2d at 117 (citations omitted). In a situation where the employer hires replacements, the employer is causing a change in the then status quo.

Employer next argues that there was ample evidence in the record to prove that work remained available to Claimants, and therefore, they are not entitled to unemployment benefits. Our review of the record does not reveal such evidence. Although, as Employer contends, some statements were communicated to the strikers that no decision had been made relative to permanent replacements, such assurances were belied by Employer's actions. It is also not a compelling fact that some strikers who crossed the picket lines were reinstated. The fact remains that Employer refused to assure the Union or the striking employees who honored the picket line that work would continue to be available to the striking employees.

To summarize, the facts of this case provides an excellent example why the burden must be allocated to the employer. On the day the strike began, February 11, 1993, Employer held a press conference, where a spokesman advised those present that Employer was hiring replacement workers. These comments were quoted in articles in the local newspapers and were posted at the Union headquarters. Classified advertisements in the newspapers advertised available

positions for "permanent replacement" workers. Replacement workers made comments to those on the picket lines to the effect that they "had their jobs now." At negotiation sessions Employer refused to identify which employees were in fact replaced, and did not inform the Union that work was still available. Thus, Claimants reasonably believed that they had been permanently replaced. The Union repeatedly requested information concerning replacements from Employer and was repeatedly rebuffed. It is, therefore, not unreasonable to require Employer to show that these replacement workers were not permanent, as Claimants believed, but were temporary.

Therefore the order of the Board is affirmed.

### ORDER

NOW, July 31, 1995, the order of the Unemployment Compensation Board of Review in the above-captioned matters is hereby affirmed.

SILVESTRI, Senior Judge, dissents.