505 Pa. 379 (1984)
479 A.2d 967
Robert G. HIGH, Josephine F. Lapi, Joseph E. Ambrose, Dennis C. Frymoyer, Dolores C. Myatt, John Karahuta, Appellants,
v.
COMMONWEALTH of Pennsylvania, UNEMPLOYMENT COMPENSATION BOARD OF REVIEW, Appellee.
Supreme Court of Pennsylvania.
Re-Argued April 12, 1984.
Decided August 8, 1984.
*380 A. Martin Herring, Jenkintown, for appellants.
William J. Kennedy, Richard L. Cole, Jr., Charles G. Hasson, Harrisburg, Richard F. Faux, Lansdale, for appellee.
John M. Stott, Reading, for Reading School Dist., Berks Co.
Michael I. Levin, Harrisburg, for amicus.
Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, HUTCHINSON, ZAPPALA and PAPADAKOS, JJ.

OPINION OF THE COURT
PAPADAKOS, Justice.
Unemployment Compensation Claimants, Robert G. High, et al., representative of other claimants similarly situated, appeal a Commonwealth Court order 67 Pa.Cmwlth. 472, 447 A.2d 701 (1982) affirming the Unemployment Compensation Review Board's denial of their benefit claims. We affirm.
Claimants are teachers in Reading School District and are represented for collective bargaining purposes by the Reading Education Association (REA), as are all other teachers in the district. REA and the District were parties to a *381 collective bargaining agreement which expired on June 30, 1978, without a new agreement being reached.
On September 5, 1978, the beginning of the new school term, the District unilaterally instituted a longer working day for the teachers than had existed under the expired agreement. In spite of this, Claimants and the other teachers reported to work because REA and the District were at that time engaged in a collective bargaining impasse proceeding under the Public Employe Relations Act[1], and REA reasonably believed that the Act prohibited a strike prior to the impasse proceeding's completion.[2]
By letter of October 13, 1978, REA offered to continue working past the impasse procedure exhaustion-date of October 24, 1978, under the terms and conditions of the expired agreement, and also to provide twenty-four (24) hours notice of a work stoppage. The District did not accept this offer. On October 20, 1978, REA reiterated its offer by "Mailgram," expanding the strike-notice period to fifty (50) hours. The District also rejected this offer. Finally, by letter of October 24, 1978, REA again offered to continue working under the expired agreement's terms and conditions. Because the students' scheduled day then extended beyond that of the teachers under the expired agreement, the offer was made on condition that the District make arrangements for student supervision at the end of the school day. This letter was hand-delivered to the District Superintendent of Schools, Jack Neal, who assured REA that the requested supervision would be provided.
The teachers reported to work on October 25, 1978, but the District failed to provide the requested supervision. That evening REA voted a work-stoppage because of concern over the lack of student supervision and, also, because of indications by the District that teacher salaries would be *382 reduced proportionately to the amount of time the students were unsupervised. In effect, the District demanded that the teachers work a longer day than provided for under the terms of the expired contract or suffer a proportionate cut in pay. The teachers did not report to work the next day. No one seriously questions the status of this work stoppage as being a lock-out.
Two days later, on October 28, 1978, the District offered in writing to resume operations under the terms and conditions of the expired agreement, but REA rejected the offer that same day. The issue arises whether this rejection by the REA converted the status of the work stoppage from a lock-out to a strike. The teachers did not return to work throughout the labor dispute, which was settled on November 28, 1978.
The Bureau (now Office) of Employment Security denied the Claimants' subsequent applications for benefits, determining that their unemployment was the result of a strike, and concluding that they were thus disqualified for benefits by Section 402(d) of the Unemployment Compensation Law[3]. That section provides a benefit disqualification for those whose unemployment is due to a work stoppage other than a lock-out. The Referee reversed, but provided no clear rationale in his decision for the reversal. The Board reversed the Referee's decision, stating that benefit determinations under the Unemployment Compensation Law are to be made on a week-by-week basis and that the conditions existing in a given week are determinative of benefit eligibility, and held that REA's rejection of the District's offer constituted the work stoppage a strike and not a lock-out and, thus, rendered the Claimants ineligible for benefits respecting the weeks which included and followed the rejection. Commonwealth Court affirmed, and this appeal followed.
The Claimants argue that the Board committed an error of law, contending that the initial cause of a work *383 stoppage is determinative of benefit eligibility for the entire duration of the work stoppage. We disagree,[4] and affirm the rule first stated by our Superior Court in Westinghouse Electric Corporation v. Unemployment Compensation Board of Review, 187 Pa.Super. 403, 413-14, 144 A.2d 679, 684 (1958):
Each week of unemployment is the subject of a separate claim, the validity of which is determined by a consideration of conditions existing within that week; consequently, a work stoppage which is initially a strike may subsequently be converted into a lockout. Burger Unemployment Compensation Case, 168 Pa.Super. 89, 91, 93, 77 A.2d 737 (1951).
This rule is in accord with our Legislature's clear mandate, as embodied in Section 402, that all determinations of benefits eligibility be made on a week-by-week basis. What the Claimants ask us to do, in essence, is to create an exception for Section 402's Subsection (d) so that determinations under that subsection are made differently than those under the others. This we will not do, for it would be contrary not only to the legislative mandate, but also to the policies underlying the Unemployment Compensation Law.
The policy underlying Section 402(d) is one of discouraging employers or employees from initiating or continuing work stoppages which, of course, defeat the Law's objectives of reducing and preventing unemployment and of promoting reemployment of unemployed workers. See Section 205 of the Law.[5] Adoption of the rule proposed by the Claimants would artificially foist responsibility for the continuance of a work stoppage upon those who may be *384 earnestly attempting to end it. It would do nothing to further the aforementioned objectives, nor would it further the objective of benefiting persons unemployed through no fault of their own. Section 3 of the Law.[6] We must, therefore, reject the Claimants' proposition.
Affirmed.
LARSEN, J., filed a dissenting opinion in which NIX, C.J., and ZAPPALA, J., joined.
LARSEN, Justice, dissenting.
I dissent.
In this appeal, Robert G. High[1] (appellant) appeals from a judgment of the Commonwealth Court[2] which affirmed the decision of the Unemployment Compensation Board of Review (Board) denying him benefits pursuant to Section 402(d) of the Unemployment Compensation Law.[3]
The facts as found by the Board establish that the appellant is a professional employee of the Reading School District (School District) and a member of the Reading Education Association (Association). The Association is the collective bargaining agent for a bargaining unit with the School District.
A collective bargaining agreement dated October 27, 1976 between the School District and the Association expired on *385 June 30, 1978. Prior to the expiration of the agreement, the School District and the Association conducted negotiations in an attempt to reach a new contract. As negotiations continued without bringing about a new agreement, it became apparent that an impasse existed between the parties. Pursuant to the provisions of the Public Employe Relations Act[4] the School District and the Association submitted their dispute to mediation and fact finding.
During the course of the on-going negotiations, the School District informed the Association that the work day which appellant and his fellow Association members had worked over the term of the expired agreement was no longer satisfactory. The School District announced that beginning with the start of the new school year on September 5, 1978, the workday would be extended to eight hours. During the three years covered by the expired agreement, neither the appellant nor any of the other Association members worked longer than 7 hours and 25 minutes a day.[5] The appellant and the Association did not agree to the enlarged work day and reiterated an offer, which had been repeatedly proposed during the negotiations, to continue to work under the same terms and conditions as existed under the expired agreement. Having failed to conclude an agreement and reasonably believing that the law prohibits a strike during the mediation and fact finding process, the appellant and his fellow Association members reported for work on September 5, 1978 and worked the lengthened workday from then through October 25, 1978.
*386 The mediation and fact finding procedures terminated on October 24, 1978 removing the prohibition of a strike. Prior to the termination of the statutory mechanism, the School District informed the Association and the appellant that on October 25, 1978 the shorter workday which prevailed under the expired agreement would be restored. When the appellant reported for work on October 25, 1978, the workday had not been reduced and he and the other Association members were expected to continue working the enlarged workday. The Association made more than one bona fide offer to continue to work under the same terms and conditions of the expired collective bargaining agreement, however, the School District did not agree to the offers. Since the appellant was unable to continue to work under the same terms and conditions of the lapsed agreement, he withheld his services from the School District beginning on October 26, 1978. This action was taken by appellant along with the other members of the Association pursuant to a vote by the Association membership. On October 28, 1978, two days after the onset of the work stoppage, the School District presented an offer to the Association to have work resumed under the terms and conditions, including the shorter workday, which prevailed while the expired agreement was in effect. The Association rejected the School District's offer and the appellant did not return to work until the labor dispute ended on November 28, 1978.[6]
The appellant's application for unemployment compensation benefits was denied by the Bureau of Employment Security[7] for the reason that his unemployment was due to a strike. The appellant appealed this determination and the referee reversed the finding that appellant was unemployed *387 due to a strike and ruled that he was entitled to benefits in that his unemployment was due to a lockout. On further appeal, the Board reversed the referee concluding that the work stoppage started as a lockout but was converted to a strike when the Association rejected the School District's offer on October 28, 1978. Even though the Board found that a lockout existed on October 26 and October 27, the appellant was denied all benefits for the week ending October 28, 1978 pursuant to the provisions of Section 402(d) of the Unemployment Compensation Law.[8]
The question this Court is called upon to decide is whether the action of the school district in offering to reopen the schools and re-establish the status quo as it existed under the provisions of the expired agreement, made two days after the work stoppage began, converted what was a lockout into a strike? The majority concludes that the lockout was converted to a strike with the consequence that the appellant is not entitled to unemployment compensation benefits. Citing Westinghouse Electric Corporation v. Unemployment Compensation Board of Review, 187 Pa. Super. 403, 144 A.2d 679 (1958), the majority states:
Each week of unemployment is the subject of a separate claim, the validity of which is determined by a consideration of conditions existing within that week, consequently, a work stoppage which is initially a strike may subsequently be converted into a lockout. Burger Unemployment Compensation Case, 168 Pa.Super. 89, 91, 93, 77 A.2d 737 (1951)
I find this reasoning curious in that the conclusion that "a work stoppage which is initially a strike may be subsequently converted into a lockout" or vice versa, simply does not follow from the premise that "each week of unemployment is the subject of a separate claim, the validity of which is determined by a consideration of conditions existing within *388 that week." I agree that the statute requires that each week of unemployment is the subject of a separate claim. I disagree, however, that this statutory requirement provides a basis for the conclusion that the work stoppage in this case was converted from a lockout to a strike. Whether a work stoppage is a lockout or a strike is determined by the circumstances that caused the stoppage in the first instance.
In Vrotney Unemployment Compensations Case, 400 Pa. 440, 163 A.2d 91 (1960) we adopted a test to distinguish a strike from a lockout for purposes of unemployment compensation benefits.
"Have the employees offered to continue working for a reasonable time under the pre-existing terms and conditions of employment so as to avert a work stoppage pending the final settlement of the contract negotiations; and has the employer agreed to permit work to continue for a reasonable time under the pre-existing terms and conditions of employment pending further negotiations? If the employer refuses to so extend the expiring contract and maintain the status quo, then the resulting work stoppage constitutes a `lockout' and the disqualification for unemployment compensation benefits in the case of a `stoppage of work because of a labor dispute' does not apply."
Id., 400 Pa. at 444-45, 163 A.2d at 93-94. We have consistently applied this test in unemployment cases involving a labor dispute. See: Unemployment Compensation Board of Review v. Sun Oil Company, 476 Pa. 589, 383 A.2d 519 (1978); Philco Corporation v. Unemployment Compensation Board of Review, 430 Pa. 101, 242 A.2d 454 (1968). See also: School District of The City of Erie v. Unemployment Compensation Board of Review, 48 Pa.Cmwlth. 460, 409 A.2d 982 (1980); Unemployment Compensation Board of Review v. Borger Steel Co., 30 Pa.Cmwlth. 75, 372 A.2d 969 (1977); Toma v. Unemployment Compensation Board of Review, 4 Pa.Cmwlth. 38, 285 A.2d 201 (1971); Small Tube Products, Inc. v. Unemployment Compensation Board of Review, 198 Pa.Super. 308, 181 A.2d 854 (1962).
*389 The crucial question which this test is designed to answer is: who bears the responsibility for the work stoppage in the first instance? If initial responsibility rests with labor then the stoppage is a strike. Conversely, if accountability lies with the employer, then it is a lockout. The ultimate resolution of this issue determines the idle applicant's eligibility for unemployment compensation benefits.
In Philco Corporation v. Unemployment Compensation Board of Review, supra, we further defined the test to isolate the responsibility for a work stoppage and distinguish between a strike and a lockout as follows:
"Since the purpose of our unemployment compensation system is to compensate an individual when work has been denied him through no fault of his own, logically the test of whether a work stoppage resulted from a strike or a lockout requires us to determine which side, union or management, first refused to continue operations under the status quo after the contract had technically expired, but while negotiations were continuing." (emphasis supplied)
Id., 430 Pa. at 103, 242 A.2d at 455.
The test which we employed in Vrotney and refined in Philco leads to the conclusion that he who first refuses to continue to operate under the status quo ultimately endures the responsibility for the work stoppage.
Applying this test to the facts of the instant case, the appellant and his fellow Association members were willing, at all times prior to the work stoppage, to continue to work under the terms and conditions which prevailed under the expired collective bargaining agreement. After repeatedly offering to continue working under the status quo before the start of the new school term on September 5, 1978, the Association reiterated the offer, in writing, immediately prior to October 24, 1978, the day which marked the exhaustion of mediation and fact finding. At no time previous to the work stoppage did the School District agree to the Association's offer. In this background of the Association's offer and the School District's refusal to accept the offer, *390 the Association's membership, which included the appellant, voted to withhold services and a work stoppage resulted. It is clear that it was the School District who first refused to continue to operate under the status quo.[9] In this context, it is the School District who bears responsibility for the work stoppage. This initial responsibility establishes the work curtailment as a lockout. It remains a lockout during each week of the stoppage.
I would hold that the School District's belated offer does not extinguish its initial responsibility. Its actions, coming after the commencement of the work stoppage does not restore the parties to the positions they respectively held prior to the stoppage. Responsibility for the work stoppage and thus, the determination of whether the stoppage is a strike or a lockout is established at its inception. Actions taken after the cessation of work activity cannot erase the initial responsibility and place the parties in the positions they previously occupied. If it were otherwise, responsibility for a work stoppage would be subject to repeated change. A lockout on Monday could be a strike on Wednesday, a lockout again on Friday, and so on and so forth. This would tend to encourage parties to continually jockey for position at the expense of sincere negotiations toward a settlement. Where the labor dispute involves a School District and teachers, as it does here, the education of the Commonwealth's children is also at stake. Fixing responsibility at the outset forces the parties to act responsibly, sincerely and in good faith at the initial stages of a potential work stoppage. Conduct on the part of either side which fails to meet this standard results in responsibility for the stoppage (lockout or strike) and the legal ramifications following therefrom. I would reverse the order of the Commonwealth Court.
NIX, C.J., and ZAPPALA, J., join in this dissenting opinion.
NOTES
[1] Act of July 23, 1970, P.L. 563, No. 195, 43 P.S. Sections 1101.101-1101.2301. See Article VIII of the Act, Sections 801 through 806a. 43 P.S. Sections 1101.801-1101.1010.
[2] See Article X of the Act, Sections 1001 through 1010, 43 P.S. Sections 1101.1001-1101.1010.
[3] Act of December 5, 1936, Second Ex.Sess., P.L. (1937) 2897, as amended, 43 P.S. Section 802(d).
[4] Claimants cite our decisions in Vrotney Unemployment Compensation Case, 400 Pa. 440, 163 A.2d 91 (1960), and Philco Corporation v. Unemployment Compensation Board of Review, 430 Pa. 101, 242 A.2d 454 (1968), in support of their proposition. These decisions are, however, clearly inapposite to the present case, which is one of first impression, because they involved only the propriety of determinations respecting responsibility for initiation of work stoppages. Neither involved any question of a shift in responsibility for the maintenance of a work stoppage.
[5] 43 P.S. Section 765.
[6] 43 P.S. Section 752.
[1] This case involves the Unemployment Compensation Appeals of school teachers Robert G. High, Josephine F. Lapi, Joseph E. Ambrose, Dennis C. Frymoyer and Dolores C. Myatt, all members of the Reading Education Association. The appeals were litigated pursuant to an agreement between Reading School District, the Reading Education Association and the Bureau of Employment Security calling for the prosecution of five token appeals. Also involved is the appeal of John Karahuta who is not a teacher, and not a member of the Reading Education Association, but whose employment fortunes are tied to any collective bargaining agreement concluded between the Reading School District and the Reading Education Association.
[2] High v. Unemployment Compensation Board of Review, 67 Pa. Cmwlth. 472, 447 A.2d 701 (1982).
[3] 43 P.S. § 802(d).
[4] Public Employe Relations Act, 1970, July 23, P.L. 563, No. 195, Art. II § 201, 43 P.S. § 1101.101, et seq.
[5] Article XXV of the Collective Bargaining Agreement between the School District and the Association provides that the elementary teachers' day should not be more than 7 hours and 15 minutes, and the secondary teachers' day should not be more than 7 ½ hours.

The actual hours that were worked daily during the term of the expired agreement were:

Elementary school teachers: 8:30 A.M. to 3:15 P.M.
Jr. High School teachers: 8:00 A.M. to 3:25 P.M.
Senior High School teachers: 8:00 A.M. to 3:10 P.M.

[6] A review of the entire record demonstrates that the dispute between the parties ended on November 28, 1978. Finding of Fact No. 22 of the Board's decision and order erroneously sets forth the date on which the labor dispute ended as November 28, 1980. (The Board's decision was made long before then and carries mailing date of October 10, 1980.)
[7] Now Office of Employment Security.
[8] "An employe shall be ineligible for compensation for any week  (d) In which his unemployment is due to a stoppage of work, which exists because of a labor dispute (other than a lockout) at the factory, establishment or other premises at which he is or was last employed . . ." 43 P.S. § 802(d). (emphasis supplied)
[9] It should be made clear that status quo in the context of this case means the terms and conditions which existed under the expired collective bargaining agreement.