574 A.2d 57

**Kenneth E. HOFFMAN, Appellant,**

**v.**

**COMMONWEALTH of Pennsylvania, UNEMPLOYMENT COMPENSATION BOARD OF REVIEW, Appellee,**

**and**

**Joy Manufacturing Company, Intervenor, Appellee.**

Supreme Court of Pennsylvania.

Argued March 6, 1990.

Decided April 27, 1990.

Andrew J. Leger, Jr., Maurizi & Cutruzzula, Pittsburgh, for appellant.

Jerome H. Gerber, James A. Diamond, and Irwin W. Aronson, Camp Hill, for amicus curiae, Pennsylvania AFL–CIO.

Clifford F. Blaze, Deputy Chief Counsel, Jonathan Zorach, and John E. Herzog, Asst. Counsel, Pennsylvania Unemployment Compensation Bd. of Review, Harrisburgh, for appellees.

Edmund M. Carney, Rose, Schmidt, Chapman, Duff & Hasley, Pittsburgh, for Joy Mfg. Co.

Walter P. DeForest and Peter D. Post, Reed Smith Shaw & McClay, Pittsburgh, for Pennsylvania Chamber of Business and Industry, amicus curiae.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, ZAPPALA, PAPADAKOS and CAPPY, JJ.

## OPINION OF THE COURT

LARSEN, Justice.

Appellant, Kenneth E. Hoffman, token-claimant below, appeals from a judgment of the Commonwealth Court

which affirmed a decision of the Unemployment Compensation Board of Review (Board) denying him, and all similarly situated employees of Intervenor–Appellee, Joy Manufacturing Company (employer), unemployment compensation benefits pursuant to Section 402(d) of the Unemployment Compensation Law 100 Pa.Cmwlth. 264, 514 A.2d 668. In this appeal, we are called upon to decide the recurring question of whether employees who are involved in a work stoppage are eligible for unemployment compensation benefits under the provisions of section 402(d) of the Pennsylvania Unemployment Compensation Law, Act of December 5, 1936, P.L. 2897, as amended, 43 P.S. § 802(d) (1964). More specifically, we must decide whether a work stoppage which began on August 6, 1983 as a strike was converted to a lockout in October, 1983 when the employees union, the International Association of Machinists and Aerospace Workers, Local 1842 (Union), offered to return to work under the terms and conditions of the expired labor contract on a day to day basis while negotiations continued.

Initially, the Office of Employment Security (OES) granted the appellant Hoffman, as token claimant, unemployment compensation benefits pursuant to Section 402(d) of the Unemployment Compensation Law. The employer, Joy Manufacturing Company, intervenor-appellee herein, appealed from the OES determination. On March 29, 1984, a hearing on the employer's appeal was held before an Unemployment Compensation Referee. On April 18, 1984, the Referee issued a decision and order affirming the determination of the OES and allowing benefits for the compensable week ending October 29, 1983 and subsequent thereto. The employer appealed from the Referee's decision to the Unemployment Compensation Board of Review. On May 17, 1985, the Board issued a decision and order which reversed the decision and order of the Referee and denied the appellant benefits. The appellant filed an appeal from the Board's decision to the Commonwealth Court. The appeal was heard by a Commonwealth Court Panel and, in a 2–1 decision (Colins, J. dissenting), the Panel affirmed the

Board's decision denying benefits. We granted appellant's timely Petition for Allowance of Appeal. For the reasons that follow, we now reverse the order of the Commonwealth Court.

## Background

The facts as found by the Board establish that the employer and the union were parties to a collective bargaining agreement which was effective on August 6, 1980, and expired at 12:00 midnight on August 6, 1983. (That agreement pertained to and covered manufacturing employees at the employer's Franklin, Pennsylvania factory.) Negotiations for a new labor/management agreement commenced on June 7, 1983 and continued for fifteen sessions through June and July. On August 1, 1980, management and the union held their last negotiating session prior to the expiration of their bargaining agreement. The employees of the employer, Joy Manufacturing Company, who were members of the union and who were covered by the labor/management agreement worked their last day of work on August 4, 1983 under the labor contract which was set to expire on August 6, 1983. As of 12:00 midnight, August 6, 1983, the union and the employer had not negotiated a new collective bargaining agreement. The employees rejected new terms and conditions proposed by the employer and voted to strike effective midnight, August 6, 1983. Picket lines were formed and maintained at the Franklin plant by the union members commencing at 12:00 midnight, August 6, 1983 when the labor agreement expired.

Additional negotiating sessions between the employer and the union were held on August 24, 1983, August 29, 1983, September 8, 1983 and September 28, 1983. At each of these additional bargaining sessions a mediator participated. Nonetheless, these continuing and additional efforts bore no fruit. The dispute was not resolved and no new agreement was reached.

When the work stoppage began on August 6, 1983, all work units at the factory had work loads on the assembly

floor and in the assembly stalls. Following the commencement of the work stoppage and continuing for approximately four weeks, the employer maintained the partially finished work-in-progress on the floor and in the stalls. Thereafter, the employer removed the partially finished work-in-progress from its Franklin, Pennsylvania plant by transferring some of the work to its various service centers at other locations (in Pennsylvania and elsewhere) and shipping other of the work to independent outside vendors for completion and delivery to customers. The employer waited approximately four weeks before shipping the partially completed work-in-progress for completion elsewhere because, based on the history of previous labor/management negotiations, there was a good chance that a new labor agreement might be reached within that time frame. If the appellant through the union had offered to return to work at any time during the approximate four week period immediately following the work stoppage on August 6, 1983, the partially finished work-in-progress would still have been at the Franklin plant and work would have been available on a day-to-day basis. Once, however, the partially finished work-in-progress was removed from the Franklin plant and shipped elsewhere for completion, it was not possible to have it returned to the Franklin plant for completion. Further, in order to resume the level of operations that prevailed at the employer's Franklin plant prior to August 6, 1983, a start-up period of 60 to 70 days was necessary. Additionally, after the shutdown from August 6, 1983 to October 19, 1983, the employer needed a preliminary start-up time of at least two days to perform maintenance on the machines which had been lying idle.

On October 19, 1983, the union submitted three offers to the employer to settle the labor dispute. The first offer was to go back to work for a period of one year under the terms and conditions of the expired 1980 agreement and with the additional conditions that: (i) there would be continuing cost of living adjustments, and (ii) no disciplinary action would be taken against any employee who partici-

pated in the work stoppage. Under this offer, there was the further proviso that both sides would be bound by these terms for one year, and the agreement would not be subject to continuing negotiations. The employer rejected this first proposal. Next, the union proposed to settle the dispute and go back to work for one year under the precise terms and conditions of the expired 1980 labor agreement, without the continuing cost of living raises and without the stipulation of no disciplinary action against strikers. Again, under this offer, both sides would be bound for one year, and there would be no further negotiations concerning the terms of employment for that period. The employer rejected this second union proposal of settlement. Finally, the union offered to resume work under the terms and conditions of the 1980 collective bargaining agreement on a day-to-day basis while negotiations for a new labor agreement continued. Again, the employer rejected the union's offer. At no time did the employer make a counter-proposal to any of the three union offers of October 19, 1983. Further, the employer did not even suggest what terms it would consider acceptable to permit the employees to return to work.

The employer rejected the union's offer to return to work on a day-to-day basis for the reason that, as of the date of the union's offer, work was not available at the Franklin plant on a day-to-day basis. Further, because all work in progress had been shipped to other locations, it was not practical to resume operations at that plant on a day-to-day basis. Eventually, the work stoppage was resolved and operations resumed effective November 20, 1983.

## I.

█ The scope of review in an appeal from an adjudication of the Unemployment Compensation Board of Review is that we must affirm unless the adjudication violates the constitutional rights of the appellant, or is contrary to law, or that the Board's procedure was violated, or a finding of fact necessary to the decision is not supported by substan-

tial evidence. *Miceli v. Unemployment Comp. Bd. of Review*, 519 Pa. 515, 549 A.2d 113 (1988) citing: 2 Pa.C.S.A. § 704; *Estate of McGovern v. State Employees' Retirement Board*, 512 Pa. 377, 517 A.2d 523 (1986) and *Taylor v. Unemployment Compensation Review Board*, 40 Pa. Cmwlth 577, 398 A.2d 231 (1979). In this case the appellant makes no claim that his constitutional rights were violated. Likewise, he does not allege any violation of procedure before the Board. The appellant asserts that the decision of the Board, which was affirmed by the Commonwealth Court, is contrary to law. Our review therefore will focus upon whether the decision denying appellant benefits is founded upon an error of law.

## II.

Section 402(d) of the Pennsylvania Unemployment Compensation Law provides, in relevant part, as follows:

An employe shall be ineligible for compensation for any week—

(d) In which his unemployment is due to a stoppage of work, which exists because of a labor dispute (other than a lockout) at the factory, establishment or other premises at which he is or was last employed: . . . .

43 P.S. § 802(d) (1964).

The question of appellant's eligibility for unemployment compensation in this case specifically pertains to the week ending October 29, 1983 and the weeks thereafter up to the date that the labor dispute was settled and he was able to return to work. (November 20, 1983) The appellant argues that the Board erred in construing Section 402(d) of the Unemployment Compensation Law by inappropriately introducing and considering the question of economic justification in determining whether the work stoppage was converted from a strike to a lockout when the employer refused the union's offer to return to work on a day-to-day basis. In *High v. Unemployment Compensation Bd. of Review*, 505 Pa. 379, 479 A.2d 967 (1985), we affirmed the principle that

a work stoppage which begins as a strike may later be transformed into a lockout.

> Each week of unemployment is the subject of a separate claim, the validity of which is determined by a consideration of conditions existing within that week; consequently, a work stoppage which is initially a strike may subsequently be converted into a lockout. *Burger Unemployment Compensation Case*, 168 Pa.Super. 89, 91, 93, 77 A.2d 737 (1951).

*Id.* 479 A.2d at 969, citing: *Westinghouse Electric Corporation v. Unemployment Compensation Board of Review*, 187 Pa.Super. 403, 413–14, 144 A.2d 679, 684 (1958). Thus, although the work stoppage in the instant case began as a strike on August 6, 1983, the appellant argues that it was converted into a lockout on October 19, 1983 when his union's offer to return to work on a day-to-day basis was rejected by the employer. The employer contends that the economic circumstances caused by stripping the plant of all work in progress justified its rejection of the union's offer to return to work on a day-to-day basis; thus, the continuing work stoppage remained a strike.

In *Vrotney Unemployment Compensation Case*, 400 Pa. 440, 163 A.2d 91 (1960), we adopted a test to distinguish between a strike and a lockout for purposes of unemployment compensation benefits.

> Have the employees offered to continue working for a reasonable time under the pre-existing terms and conditions of employment so as to avert a work stoppage pending the final settlement of the contract negotiations; and has the employer agreed to permit work to continue for a reasonable time under the pre-existing terms and conditions of employment pending further negotiations? If the employer refuses to so extend the expiring contract and maintain the status quo, then the resulting work stoppage constitutes a 'lockout' and the disqualification for unemployment compensation benefits in the case of 'stoppage of work because of a labor dispute' does not apply.

*Id.,* 400 Pa. at 444–45, 163 A.2d at 93–94. The *Vrotney* test for distinguishing a strike and a lockout has been uniformly applied in unemployment compensation cases where a labor dispute has resulted in a work stoppage. *Miceli v. Unemployment Comp. Bd. of Review,* supra, 549 A.2d at 115, citing: *Local 730 v. Unemployment Compensation Board of Review,* 505 Pa. 480, 480 A.2d 1000 (1984); *Fairview School District v. Unemployment Compensation Board of Review,* 499 Pa. 539, 454 A.2d 517 (1982); *Unemployment Compensation Board of Review v. Sun Oil Company,* 476 Pa. 589, 383 A.2d 519 (1978); *Philco Corporation v. Unemployment Compensation Board of Review,* 430 Pa. 101, 242 A.2d 454 (1968). See also: *Norwin School District v. Belan,* 510 Pa. 255, 507 A.2d 373 (1986) (plurality opinion), and *High v. Unemployment Compensation Board of Review,* 505 Pa. 379, 479 A.2d 967 (1984) (dissenting opinion, Larsen, J.).

Applying our holding in *High* in conjunction with the *Vrotney* test to the instant case, it is clear that the work stoppage at the employer's Franklin plant began on August 6, 1983 as a strike. That status continued until the week ending October 29, 1983, when, during that week, the employees, among other proposals, offered to continue working under the pre-existing terms and conditions of employment on a day-to-day basis to avert a continuation of the work stoppage. The employer refused the employees' offer which thus resulted in prolonging the work stoppage. At this point, if the union's offer to resume working on a day-to-day basis was an offer to work for a reasonable time under the pre-existing terms and conditions of employment, the strike was converted to a lockout.

The employer's position is that the employees' offer to resume working under the pre-existing terms and conditions on a day-to-day basis was not an offer to resume working for a reasonable time as required by *Vrotney.* In the proceedings below, the Board agreed with the employer and concluded that, "from what had transpired at the employer's plant since the date of the work stoppage that

such an offer [as made by the union] would not re-establish the status quo."[1] (Decision and Order of the Unemployment Compensation Board, May 17, 1985, pg. 3). On appeal to the Commonwealth Court, that court stated:

> "In view of the fact that almost three months elapsed from the time that the Union went out on strike until it offered to resume work under the status quo, and that the Employer found it economically necessary to reassign the work in progress during the strike, we do not believe that the Union's offer to resume work on a day-to-day basis was an offer to work for a reasonable time."

*Hoffman v. Unemployment Comp. Bd. of Review*, 100 Pa.Cmwlth 264, 269, 514 A.2d 668, 671 (1986).

In *Hershey Estates v. Unemployment Compensation Board of Review*, 400 Pa. 446, 163 A.2d 535 (1960), decided the same day as *Vrotney*, we analyzed the "reasonable time" requirement of the *Vrotney* test. In *Hershey Estates*, as a labor agreement was about to expire, the union offered to have the employees continue working on a day-to-day basis under the pre-existing terms and conditions of employment as negotiations continued. The employer, Hershey Estates, rejected the union's proposal and a work stoppage ensued. When the question of whether the work stoppage was a strike or a lockout for purposes of unemployment benefits came before us, we held that the union's offer was not an offer to continue working for a reasonable time. In reaching this conclusion, we emphasized that Hershey Estates was primarily in the service business. Hershey Estates operated, among other things, a hotel, laundry, department store, community inn, etc. "The *nature of these industries* is such that it would be almost impossible to operate them adequately on a day to day basis." *Id.*, 400 Pa. at 451, 163 A.2d at 537. (Emphasis added) We went on to say that, under the circumstances,

---

**1.** What had transpired at the employer's Franklin plant after the work stoppage began on August 6, 1983 was the removal of all work in progress to various company service centers and outside vendors, with the employer's commitment that those service centers and vendors would complete and deliver that work.

the employer, Hershey Estates, was justified in holding to the position that it would be impractical to operate a hotel, etc. on a day to day basis. We observed that "[T]he rejection of such an offer could well be anticipated by the union." *Id.* Conversely, in *Penn Mfg. Corp. v. Unemployment Comp. Bd. of Review*, 215 Pa.Super 310, 264 A.2d 726 (1969), the Superior Court held that the union's offer to continue working under the pre-existing terms and conditions with twenty-four hours notice of a work stoppage was reasonable. Likewise, in *McKeesport Area School District v. Unemployment Comp. Bd. of Review*, 40 Pa.Cmwlth. 334, 397 A.2d 458 (1978), the Commonwealth Court found that the teachers' offer to continue working under the expired contract on a day-to-day basis was not unreasonable. Neither *Penn Mfg. Corp.* nor *McKeesport Area* involved an employer in service industries similar to *Hershey Estates*.

In the present case we are not dealing with an industry, which, by its *nature*, renders it impossible or impractical to operate on a twenty-four hours basis as we found was the case in *Hershey Estates*. On the contrary, the Board found, and the record sufficiently supports, that had the union made the same offer to resume work on a day-to-day basis at any time during the first four weeks of the work stoppage, work in progress was available and the offer would have been reasonable. It was only because the employer had removed the work in progress from the Franklin plant leaving the facility without available work that the Board and the Commonwealth Court reasoned that it would not have been practical for the employer to operate its factory on a day-to-day basis. Thus, the Board and the Commonwealth Court concluded that the "day-to-day" offer was not an offer for a reasonable time. We disagree.

The declared policy of the Unemployment Compensation Act is:

Economic insecurity due to unemployment is a serious menace to the health, morals and welfare of the people of the Commonwealth. Involuntary unemployment and its resulting burden of indigency falls with crushing force

upon the unemployed worker, and ultimately upon the Commonwealth and its political subdivisions in the form of poor relief assistance. Security against unemployment and the spread of indigency can best be provided by the systematic setting aside of financial reserves to be used as compensation for loss of wages by employees during periods when they become unemployed through no fault of their own....

43 Pa.C.S. § 752 "[T]he purpose of our unemployment compensation system is to compensate an individual when work has been denied him through no fault of his own ..." *Philco v. Unemployment Comp. Bd. of Review*, 430 Pa. 101, 242 A.2d 454, 455 (1968). When an individual is unable to work because of a lockout, that individual has been denied work through no fault of his own and is thus entitled, under the law, to unemployment benefits. The determination of who bears responsibility for the work stoppage or the continuation of the work stoppage is made by applying the *Vrotney* standard.

"*Vrotney* was designed to encourage the continuation of the work relationship under terms previously agreed to by the parties during that difficult period between the expiration of the old agreement and before the new terms of employment had been agreed upon."

*Local 730 v. Unemployment Comp. Bd. of Review*, 505 Pa. 480, 480 A.2d 1000 (1984). The *Vrotney* standard is simple and easy to apply on an administrative level. See *Miceli v. Unemployment Comp. Bd. of Review*, supra. It is not necessary to make inquiries into issues of good faith and economic justification as the Board and the Commonwealth Court have done here. These inquiries have led the Board and Commonwealth Court to deviate from the maxim of simplicity and unduly complicate the question of who bears responsibility for the continuation of the work stoppage.

The work stoppage in this case began as a strike on August 6, 1983. At that time, the appellant and his fellow workers were unemployed because of a work stoppage due to a labor dispute other than a lockout, and thus were

ineligible for unemployment benefits. The employer is in the business of manufacturing mining machinery and equipment. There is nothing in the record which would tend to establish that the nature of the employer's manufacturing business made it impossible or impractical to continue operations on a day-to-day basis. The record does establish however, that between August 6, 1983 and October 19, 1983 the employer voluntarily chose to remove all work in progress from the struck plant. The employer made this decision to ship all work in progress elsewhere for completion knowing full well that there was a possibility that the union could offer to restore the status quo and resume operations under the terms and conditions of the pre-existing contract. Obviously, the employer chose to have the work completed at other facilities in order to relieve the economic pressures caused by the strike. Economic pressure is one of the purposes of a strike. Without such pressures on the employer, reasonable and amicable settlements would be difficult to achieve.[2] If an employer, in an attempt to lessen or relieve the economic pressures brought on by a lawful strike, clears its entire plant of work and commits the completion and delivery of that work to other company locations not affected by the strike and to independent vendors, it is not for the Unemployment Compensation Board to inquire into the economic justification of the employer's actions. The nature of the employer's manufacturing business and the work available at the Franklin plant on August 6, 1983 when the strike commenced indicate that a continuation of work on a day-to-day basis under the pre-existing terms and conditions of employment was not only possible, but entirely reasonable. When the union made the offer to resume work on a day-to-day basis on October 19, 1983 after the employer had summarily rejected two previous offers to return to work for one year, there was no reason for the union to believe that the offer was

2. By striking, the employees bring economic pressures to bear upon themselves which remain and intensify as the strike continues. When employees are locked out, those pressures are lessened somewhat but not relieved by unemployment compensation benefits.

anything but reasonable. There was plenty of work available when the strike began and the nature of the employer's business did not obviously render a resumption of work on a day-to-day basis manifestly unreasonable.

■ When a work force is on strike and a plant operation is shut down, it is not in the interest of the worker, the company or society to have each side posturing for position. We do not favor gamesmanship in labor negotiations. It is essential that all parties approach negotiations with proper motives and deal with each other in good faith. It is in this context that we apply the *Vrotney* test and determine responsibility for the continuation of a work stoppage. In *High*, we held that each week of unemployment is the subject of a separate claim, consequently a work stoppage which begins as a strike may later become a lockout. *High v. Unemployment Comp. Bd. of Review*, 479 A.2d at 969. Knowing this, an employer cannot divest itself of all available work and then reject offers to resume work based upon a self created and unarticulated "new time frame" which the employer deems reasonable for an agreement to resume operations under the terms and conditions of the old contract. This is what the employer has done in this case whatever the motives.

We hold that the economic motives of the employer in shipping all work in progress elsewhere for completion are not relevant to the determination of whether the employees' offer to return to work on a day-to-day basis under the pre-existing terms and conditions of employment is for a reasonable time. The *Vrotney* test is to be applied without regard to the employer's economic motives. In so applying the test here, we find that the union's offer of October 19, 1983 to return to work on a day-to-day basis was an offer for a reasonable time. The nature of the employer's manufacturing business does not render the resumption of operations on a day-to-day basis impossible or impractical. The employer had previously agreed to an extension of a labor contract with a different bargaining unit representing time study employees at the Franklin plant which provided for a

two-day termination notice. Obviously, this two-day period was considered reasonable by the employer. In addition, there is no dispute that continuation of work on a day-to-day basis under the terms and conditions of the expired contract constituted work for a reasonable time until the employer chose to remove all work in progress from its plant and proceeded to commit the completion of that work to other locations.

The order of the Commonwealth Court is reversed and the order of the Referee which granted unemployment benefits is reinstated.

FLAHERTY, J., files a concurring opinion.

NIX, C.J., files a dissenting opinion in which McDERMOTT, J., joins.

FLAHERTY, Justice, concurring.

I deem it unwise to express such a mechanical application of *Vrotney*, as such could work to offset the reasonable economic balance affected on both sides of a work stoppage. Here, since there was no finding that to provide employment on a day to day basis on August 6, 1983 was economically unreasonable, I concur in the result.

NIX, Chief Justice, dissenting.

In the present situation we are not reviewing the characterization of the original work stoppage, but rather we are seeking to employ the *"Vrotney"* test where the question is whether the character of the work stoppage has changed. In the latter case, the majority has permitted the party who concededly initiated the work stoppage to benefit from a presumption that any subsequent offer to restore an employment relationship was reasonable. Such a result will in my judgment work an unfairness to both management and employees. The character of a work stoppage should remain intact until the party seeking to alter that character sets forth facts establishing the reasonableness, both economic and otherwise, of an offer to resume employment.

Because I believe that the majority's distortion of the "*Vrotney*" test will be unfair to both parties in future application, I must now dissent.

McDERMOTT, J., joins in this dissenting opinion.