146 Pa. Commonwealth Ct. 77 (1992)
604 A.2d 1159
HERCULES, INC., Petitioner,
v.
UNEMPLOYMENT COMPENSATION BOARD OF REVIEW, Respondent.
Commonwealth Court of Pennsylvania.
Argued October 7, 1991.
Decided February 27, 1992.
*80 Peter D. Post, for petitioner.
Maribeth Wilt-Seibert, Asst. Counsel, for respondent.
Before COLINS and PALLADINO, JJ., and BARRY, Senior Judge.
PALLADINO, Judge.
Hercules, Inc., appeals an order of the Unemployment Compensation Board of Review (Board) that granted unemployment compensation benefits to Fred G. Veres (token claimant).
At midnight on September 30, 1989, a work-stoppage occurred at Hercules' chemical plant located in West Elizabeth, Pennsylvania. The token claimant, a member of the union representing workers at the plant, filed an application for unemployment compensation benefits for the six-week period during which the work-stoppage continued. The claim was denied by the Office of Employment Security, after which a referee, following a hearing, determined that the union had been on strike, and denied benefits pursuant to subsection 402(d) of the Unemployment Compensation *81 Law, Act of December 5, 1936, Second Ex.Sess., P.L. (1937) 2897, as amended, 43 P.S. § 802(d).[1]
The token claimant appealed to the Board. Without taking additional testimony or evidence, the Board reversed the referee, deciding there had been a lock-out, and granted benefits. Hercules appeals.
Our scope of review in an appeal from a decision of the Board is limited to determining whether constitutional rights were violated, an error of law was committed, or findings of fact are supported by substantial evidence. Acme Corrugated Box Company v. Unemployment Compensation Board of Review, 131 Pa.Commonwealth Ct. 244, 570 A.2d 96 (1989).
Three issues are before this court on appeal. First, Hercules argues that crucial findings of fact are not supported by substantial evidence, or were made in violation of Treon v. Unemployment Compensation Board of Review, 499 Pa. 455, 453 A.2d 960 (1982). Second, Hercules argues that the facts do not support the conclusion that the union was subject to a lock-out. Finally, Hercules argues that the Board committed an error of law when it placed the burden of proof on the employer to demonstrate that it was the union that first refused to continue operations to maintain the status quo.

I. SUBSTANTIAL EVIDENCE
The Board found the following facts:
1. Claimant [Veres] has been employed by Hercules, Inc., since March 1, 1971....
2. Claimant is the president of United Steel Workers of America, Local Union 8129 (hereinafter referred to as the union), and was selected as the Lead Token Claimant regarding claims for unemployment compensation benefits *82 on behalf of the bargaining unit employees, represented by the union, for weeks October 7 through November 11, 1989.
3. There was a labor/management agreement between the union and Hercules, Inc. (hereinafter called the employer), with an expiration date of midnight on September 30, 1989.
4. On June 15, 1989, the parties commenced negotiations in an effort to arrive at a new labor/management agreement....
5. The employer operates a chemical plant on a 24-hour-per-day, seven-day-per-week basis.
6. As of September 13, 1989, no new labor/management agreement had been reached, and the employer requested the union to agree to extend the contract for a period of 31 days beyond the expiration date while negotiations continued, and the parties continue in their efforts to reach a new labor/management agreement. The union refused the employer's offer.
7. On September 14, 1989, the employer again asked the union for an extension and the union refused the employer's offer.
8. The union refused the employer's offer in order to keep bargaining pressure on the employer until the expiration of the contract.
9. Approximately three weeks before the labor/management agreement expired, the union took a strike authorization vote.
10. The strike authorization vote passed and, as a result, the union was authorized to strike if the union and the employer failed to reach a new agreement.
11. The employer began to make preparations to have supervisory personnel operate the plant in case there was a work stoppage and the union was aware of these preparations.
12. On September 28, 1989, which was the last bargaining session held before the expiration of the contract, the employer again asked for an extension while work and *83 negotiations continued under the terms and conditions of the expiring labor/management agreement and again the union refused.
13. The union did not advise the employer that it was going to go on strike the night of September 30, 1989.
14. The employer scheduled supervisors for work commencing the night of September 30, 1989, and also implemented various security precautions, including the hiring and placement of security guards.
15. Further, during the evening of September 30, 1989, the employer began locking at least some of the plant's approximately twenty-two gates from the inside.
16. The bargaining unit employees who were scheduled to report for work on the third shift commencing at 11:00 p.m. on September 30, 1989, did report as scheduled.
17. At approximately 12:00 midnight on September 30, 1989, the union employees who had reported to work as scheduled were relieved of their work duties by the supervisory employees and told to leave the plant.
18. The union employees asked the supervisory employees to sign papers stating that they had been properly relieved, but the supervisory employees refused to do so.
19. The union employees asked their supervisors to sign these papers because they did not want to be accused of walking off the job.
20. As these union employees left the plant in accordance with their supervisor's instructions, the gates were locked and chained behind them from the inside.
21. The eight gates used by motor vehicles were normally closed. However, on September 30, 1989, these eight gates were locked and chained.
22. The remaining "man" gates, which were normally chained only between shift changes, were locked and chained on September 30, 1989, and kept locked and chained twenty-four hours a day.
23. The parking lot gates were also locked and chained on September 30, 1989.

*84 24. Only one gate, a "man" gate by the locker room in the hydro area of the plant, was left open.
25. Most union employees at the plant could not reach their job sites through this gate.
26. When the union employees reported for work for the following shift, they discovered that they had been locked out of the plant.
....
31. Salaried and supervisory employees worked throughout the period of the labor dispute on 12-hour shifts.
32. Continuing work was not available for any member of the bargaining unit throughout the period of the labor dispute under the terms and conditions of the expired labor/management agreement.
33. A new labor/management agreement was reached and approved by the union membership on November 9, 1989. Employees were called back to work on November 11, 1989.
Board's Decision, at 1-3.
Hercules maintains that findings of fact 17, 22, 26 and 32 are not supported by substantial evidence of record, or were made without regard to the requirements outlined in Treon.[2]
Substantial evidence is that relevant evidence which a reasonable mind might accept as adequate to support a *85 conclusion. Peak. That conflicting evidence was presented does not necessarily mean there is no competent evidence to support the findings of the Board. Unemployment Compensation Board of Review v. Moran, 21 Pa.Commonwealth Ct. 387, 346 A.2d 591 (1975).
Where there exists overwhelming, uncontroverted evidence upon which the referee relies to make findings, and where the Board takes no additional evidence, the Board may not disregard (or make findings contrary to) such findings of the referee unless it provides reasons for doing so, Treon, or those reasons are clear from the record. Peak v. Unemployment Compensation Board of Review, 509 Pa. 267, 501 A.2d 1383 (1985). See also Office of Attorney General v. Unemployment Compensation Board of Review, 111 Pa.Commonwealth Ct. 187, 533 A.2d 1087 (1987).
Because the Board is the ultimate finder of fact, questions regarding witness credibility and the resolution of evidentiary conflicts are for the Board, Peak, and will not be disturbed by this court on appeal. Id.; Miller v. Unemployment Compensation Board of Review, 45 Pa.Commonwealth Ct. 539, 405 A.2d 1034 (1979). However, where the findings of the referee are supported by uncontroverted, overwhelming evidence, the Board may not reject such findings (or make contrary findings) unless it offers a reason for doing so, Treon, or the reason for doing so is clear from the record. Peak.

A. FINDING OF FACT 17
As to finding of fact 17, conflicting evidence was introduced at the hearing before the referee. Treon does not apply. Moreover, we conclude that substantial evidence exists to support this finding. Several of token claimant's witnesses, who were union employees, testified that at midnight on September 30, 1989, supervisory employees at the Hercules plant told them to leave the plant. See, e.g., Testimony of Paul Budai, R. 54a (after Budai asked when *86 he would have to leave, Budai's supervisor responded "Paul, as much as I would like to tell you that you could stay all night, you have to leave at midnight."); Testimony of Andrew West, R. 59a (reiterating that Budai was told by his supervisor "to leave at midnight"); Testimony of Robert Kocis, R. 133a (testifying, "We were told we were to leave, we could go."); Testimony of Dave Tautkus, R. 184 ("He [witness's supervisor] told me I had to leave.").
Though the brief of Hercules on this appeal cites evidence suggesting that the employees of the union left the plant voluntarily at midnight on September 30, we reiterate that it is for the Board and not this court to resolve evidentiary conflicts. Miller. Accordingly, we conclude that the Board's finding of fact 17 is supported by substantial evidence.

B. FINDING OF FACT 22
We also conclude that finding of fact 22 is supported by substantial evidence, at least insofar as the Board found the remaining "man" gates were locked on September 30. See, e.g., Testimony of Robert Kocis, R. 134a (stating all gates were locked at midnight).
However, the Board has cited no testimony of record that indicates these gates were "locked and chained twenty-four hours a day" during the course of the work-stoppage. Every witness testifying as to the status of the gates during the course of the work-stoppage testified that these gates were or could have been opened during the course of the work-stoppage to permit supervisory personnel to enter and leave the plant. See, e.g., Testimony of Robert Kocis, R. 146a-47a (witness saw salaried personnel entering and leaving the plant through a gate); Testimony of Ron Zanetti, R. 155a (witness not present at plant during day testified that vehicles and people could have entered and exited the plant during the day).
Accordingly, we conclude that there is no substantial evidence to support the finding that the gates were locked *87 twenty-four hours a day. Construing the testimony with respect to the gates most favorably to the union, it can be concluded only that the gates in question were always locked except for shift changes.

C. FINDING OF FACT 26
As to finding of fact 26, several members of the union testified that the gates to the Hercules plant were locked when they reported for work on the shift following the work-stoppage. See, e.g., Testimony of Della Marie Conley, R. 122a; Testimony of Ken Abels, R. 174a. Accordingly, substantial evidence supports Board finding of fact 26 which states that the union employees who reported for work on the following shift "had been locked out of the plant."[3]

D. FINDING OF FACT 32
The final Board finding of fact challenged by Hercules is Board finding of fact 32, which states that continuing work under the terms of the expired labor agreement was not available for any member of the union during the work-stoppage. Hercules argues that the Board, in finding continuing work was not available, capriciously disregarded an uncontroverted finding of the referee, specifically the referee's finding of fact 23. That finding of the referee states:
23. On October 5, 1989, a bargaining unit employee reported to the plant, not on his regularly scheduled shift, and expressed an interest in returning to work. This employee was notified, in writing, the next day that work *88 was available under the terms and conditions of the 1986 expired labor/management agreement but the employee never returned to work thereafter.
Referee's Decision, at 3.
Hercules argues the Board ignored the referee's finding of fact 23 (without offering a reason for doing so)[4] and therefore violated the Treon rule when it found its fact number 32.
The record indicates that the referee's finding of fact 23 is based on uncontroverted, overwhelming evidence. See Testimony of David Antic, R. 70a (uncontroverted testimony that union employee entered plant, and sought and was orally offered work); Hercules' Exhibit Five, R. 261a (copy of letter from Hercules to union employee offering work under terms of prior labor agreement). The union did not contest either that the employee was orally offered work or that the employee received the letter offering work. The referee's finding of fact 23 is thus based on overwhelming and uncontroverted evidence of record. Accordingly, as in Treon, the proper course is for this court to reinstate the referee's finding of fact 23. See also No. 1 Cochran, Inc. v. Unemployment Compensation Board of Review, 135 Pa.Commonwealth Ct. 252, 579 A.2d 1386 (1990), petition for allowance of appeal denied, 527 Pa. 653, 593 A.2d 424 (1991); Uniontown Newspapers, Inc. v. Unemployment Compensation Board of Review, 126 Pa.Commonwealth Ct. 102, 558 A.2d 627 (1989) (each reinstating facts on the basis of Treon).
To summarize our substantial evidence and Treon inquiries, we conclude that the Board's findings of fact 17 and 26 are supported by substantial evidence. Finding of fact *89 22 is not supported by substantial evidence to the extent it suggests the gates were not opened even to permit supervisory personnel to enter and leave the plant during the course of the work-stoppage. Additionally, the referee's finding of fact 23 is reinstated on the basis of Treon, and the Board's finding of fact 32 is not supported by substantial evidence to the extent it is inconsistent with the referee's finding of fact 23.

II. STRIKE OR LOCK-OUT
Whether a work-stoppage is a lock-out or a strike is a mixed question of fact and law subject to this court's review. Acme Corrugated Box Company. The question is answered by determining which side, union or management, first refused to continue the status quo after expiration of the labor agreement. Philco Corp. v. Unemployment Compensation Board of Review, 430 Pa. 101, 242 A.2d 454 (1968); Vrotney Unemployment Compensation Case, 400 Pa. 440, 163 A.2d 91 (1960).
In the present case, the labor agreement expired at midnight on September 30, 1989. The Board found, and we have concluded that substantial evidence exists to support the finding, see Part I.A., above, that at that time "the union employees who had reported to work as scheduled were relieved of their work duties by the supervisory employees and told to leave the plant." This finding indicates that it was "management [who] first refused to continue operations under the status quo after the contract had technically expired, but while negotiations were continuing." Philco, 430 Pa. at 103, 242 A.2d at 455.
It is notable that in Philco itself the appellant union sought to rely on the conduct of management in rejecting the union's labor agreement extension offer 36 hours prior to its expiration. Our supreme court responded by stating, "[i]n the area of labor relations, it is well known that many major and frequently unexpected concessions, by both labor and management, often occur only hours before the work stoppage is scheduled." Philco, 430 Pa. at 110, 242 A.2d at *90 458. Just as there our supreme court held that the union was not entitled to rely on management's pre-contract-expiration conduct, so too do we conclude here that Hercules was not entitled to rely on any of the union's pre-contract-expiration conduct, including that of rejecting management's status quo extension offer made two days prior to expiration of the labor agreement (finding of fact 12).
Accordingly, we hold that the work-stoppage at the Hercules plant initially took the form of a lock-out.
Citing Kearney v. Unemployment Compensation Board of Review, 89 Pa.Commonwealth Ct. 404, 492 A.2d 790 (1985), Hercules argues that the work-stoppage should nevertheless be considered a strike because Hercules asserts that whether a work-stoppage is a strike or a lock-out depends upon the representations of the union prior to the expiration of the labor agreement. Kearney addressed the question whether non-union employees who could not work because of a strike by union employees were eligible for compensation under subsection 402(d), and not the question in this case which is whether the work-stoppage was a strike or a lock-out in the first instance. We do not find Kearney applicable to the facts of this case.
Hercules next argues, citing Mosko v. Unemployment Compensation Board of Review, 199 Pa.Super. 73, 184 A.2d 395 (1962), that even if the union was subject to a lockout, the lock-out was justified on the ground that Hercules was merely attempting to enhance security at the plant. Mosko states that when a strike is imminent, and the employer has been officially notified and reasonably believes that a strike will occur, the employer may, in anticipation of the strike, take reasonably necessary measures to protect its property during the strike. Id. In this case, however, the Board found in finding of fact 13 that the union did not notify the employer that the union would strike. We therefore conclude that Mosko does not apply to the facts of this case.
*91 We further note that our conclusion that the union was locked out is not altered even given the fact that we have reinstated referee finding of fact 23. Prior cases have concluded that the status quo, once disrupted, can be restored. See High v. Unemployment Compensation Board of Review, 505 Pa. 379, 479 A.2d 967 (1984); Avco Corporation v. Unemployment Compensation Board of Review, 105 Pa.Commonwealth Ct. 316, 524 A.2d 531 (1987). In both High and Avco, the offer to restore the status quo was made to or by the union. We now hold that where the status quo has been disrupted by the employer, and the employer wishes to restore it, any offer so to do must be made by the employer directly to the union.
Though the fact that Hercules offered employment to one union member on October 5, 1989 indicates that Hercules may have been receptive to the union returning to work under the expired agreement, Hercules made no such offer of employment to the union. Accordingly, we hold here that an offer of employment to only one union member is insufficient to restore the status quo with respect to the union.
On the basis of the facts before us as outlined in Part I, above, we conclude that the members of the union were subject to a lock-out and are entitled to benefits.

III. BURDEN OF PROOF
Hercules' final argument is that the Board erred by placing the burden of proof on Hercules to show that it was the union that first refused to continue the status quo. We disagree.
Our supreme court has held that:
[W]here the Union membership votes to withhold services and the work stoppage is in the nature of a strike, claimants have the burden of showing that it was the employer who first refused to continue under the status quo.... Conversely, where ... the work-stoppage takes the form of a lockout, the burden is on the employer to *92 show that it was the claimants who first refused to continue operations under the status quo.
Miceli v. Unemployment Compensation Board of Review, 519 Pa. 515, 523, 549 A.2d 113, 116 (1988). We hold that where, as here, the claimant presented evidence to demonstrate that the work-stoppage took "the form of a lockout," Miceli requires the burden of proof to be placed on the employer for it to show it was the union that "first refused to continue operations under the status quo." Accordingly, we conclude the burden was properly placed on employer Hercules, and that the Board did not err with respect to the burden of proof.
We affirm.

ORDER
AND NOW, February 27, 1992, the order of the Unemployment Compensation Board of Review in the above-captioned matter is affirmed.
NOTES
[1] Subsection 402(d) provides that an employee shall be ineligible for compensation for any week "[i]n which his unemployment is due to a stoppage of work, which exists because of a labor dispute (other than a lock-out)...."
[2] Hercules also suggests that finding of fact 19 is not supported by substantial evidence and that finding of fact 8 was improper. We conclude that finding of fact 19 is supported by substantial evidence. See Testimony of Robert Kocis, R. 142a (signing of form was to indicate "that you were properly ... relieved" and to prevent the accusation that employees "just walked off the job" and were not "properly relieved").

Additionally, though Hercules objects to finding of fact 8 because it considers the union's motive for rejecting the offer of Hercules to continue the status quo, we agree with the Board that finding of fact 8 merely recites the negotiation strategy of the union prior to the expiration of the contract. The Board did not rely on finding of fact 8 in concluding that the union was locked out, which is a determination that is measured as of the time of the expiration of the existing labor contract. Philco Corp. v. Unemployment Compensation Board of Review, 430 Pa. 101, 242 A.2d 454 (1968).
[3] By concluding that substantial evidence supports finding of fact 26, we are deciding only that the Board properly found as a fact that union members were physically locked out of the Hercules plant at the beginning of the next shift. We are not at this point concluding that the union was "locked out" for purposes of subsection 402(d). Whether a work-stoppage is a lock-out or a strike is a mixed question of fact and law subject to this court's review, Acme Corrugated Box Company, and, as previously noted, the question is answered by determining which side, union or management, first refused to continue the status quo after expiration of the labor agreement. Philco. See Part II, below.
[4] The Board satisfies its obligation under Treon if it either sets forth its reasons for "reversing" the referee, or if the reason for the reversal is clear on the record. Office of Attorney General v. Unemployment Compensation Board of Review, 111 Pa.Commonwealth Ct. 187, 533 A.2d 1087 (1987). In this case, however, the Board did not set forth its reasons for adopting a finding of fact contrary to the referee's finding of fact 23. Nor do we conclude that any reason is clear from the record.